# EXHIBIT A

BRIAN C. BROOK, ESQ.
(N.J. Bar No. 050442013)
CLINTON BROOK & PEED
641 Lexington Ave., 13th Floor
New York, New York 10022
Tel: (212) 328-9559
Fax: (212) 328-9560
brian@clintonbrook.com

*Attorneys for Plaintiff Eric Inselberg*

MICHAEL S. KASANOFF, ESQ.
(N.J. Bar No. 035751993)
157 Broad Street, Suite 321
P.O. Box 8175
Red Bank, New Jersey 0770 RECEIVED
Tel: (908) 902-5900
Fax: (732) 741-7528          JAN 29 2014
mkasanoff@att.net

SUPERIOR COURT OF NEW JERSEY
COUNTY OF BERGEN
FINANCE DIVISION

| | |
|---|---|
| ERIC INSELBERG, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION |
| Plaintiff, | BERGEN COUNTY |
| | |
| v. | Docket No. |
| | |
| NEW YORK FOOTBALL GIANTS, INC., | Civil Action |
| JOHN K. MARA, WILLIAM J. HELLER, | |
| CHRISTINE PROCOPS, EDWARD | |
| WAGNER, JR., JOSEPH SKIBA, | |
| EDWARD SKIBA, ELI MANNING, | **COMPLAINT AND JURY DEMAND** |
| BARRY BARONE, PARK CLEANERS, | |
| INC. and JOHN DOES A-Z, | |
| | |
| Defendants. | |

Plaintiff, ERIC INSELBERG ("Inselberg" or "Plaintiff"), having his mailing address at

P.O. Box 833, in Short Hills, New Jersey, by way of Complaint against the Defendants NEW

YORK FOOTBALL GIANTS, INC., JOHN K. MARA, WILLIAM J. HELLER, CHRISTINE

PROCOPS, EDWARD WAGNER, JR., JOSEPH SKIBA, EDWARD SKIBA, and ELI

MANNING (collectively, the "Giants"), and against the Defendants PARK CLEANERS, INC.,

BARRY BARONE, and JOHN DOES A-Z, (all of the foregoing collectively referred to as

"Defendants") says:

## NATURE OF THE ACTION

This case arises from the complete breakdown of integrity and institutional control within one of the most storied and revered of American sports franchises: The New York Giants.

When an FBI probe into fraudulent sports memorabilia sales began looking into the Giants' equipment managers and cleaners, individuals within the Giants organization—driven by a Machiavellian desire to protect that organization—coerced and intimidated witnesses into lying to the FBI. When those lies became the key to securing an indictment against a well-respected sports memorabilia collector and reseller, some of those witnesses were called to testify before a federal Grand Jury, where the lying continued under oath.

These acts of obstruction and perjury achieved their purpose: The FBI never learned about how several Giants employees, including the franchise quarterback, repeatedly engaged in the distribution of fraudulent Giants memorabilia. But the cost of the Giants' cover up was that the Grand Jury indicted an innocent man: the Plaintiff, Eric Inselberg. Even though that indictment was ultimately dismissed before trial—the Assistant U.S. Attorney requested dismissal after defense lawyers filed a pretrial motion demonstrating that Giants employees had lied to the Grand Jury—it was too late. The damage was already done. A wrongful indictment had turned Inselberg's personal and professional life upside-down, causing severe psychological trauma and the loss of millions of dollars of income and property. The Giants and their employees must be held accountable for the devastation they have wrought.

2

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................................ 2

TABLE OF CONTENTS............................................................................................................. 3

THE PARTIES............................................................................................................................. 5

BACKGROUND ......................................................................................................................... 7

    The Sports Memorabilia Business Generally ..................................................................... 7

    Plaintiff's Involvement in Sports Memorabilia .................................................................. 8

    Plaintiff's Other Business Ventures.................................................................................. 10

        The Football Helmet Design Patents ("Helmet Patents")...................................... 10

        The Wireless Audience Participation Patents ("Wireless Patents") ...................... 12

    Plaintiff's Relationship with the Giants' Management...................................................... 14

        The Legacy Club................................................................................................... 14

        Wireless Marketing............................................................................................... 15

        Chase Banking Deal.............................................................................................. 16

    The Government Investigation of Game-Worn Jersey Fraud............................................ 17

THE DEFENDANTS' MISCONDUCT..................................................................................... 18

    Lies during the Government Investigation ....................................................................... 18

    The Giants' General Counsel Worked Tirelessly to Insulate the Giants
    from the FBI Investigation and Potential Negative Publicity........................................... 24

    Perjury before the Grand Jury.......................................................................................... 29

    The Giants' Involvement in Game-Used Memorabilia Fraud .......................................... 33

THE WRONGFUL INDICTMENT ........................................................................................... 38

    Inselberg Is Indicted By the Grand Jury Immediately After the Skibas Testify............... 38

    The U.S. Attorney Dismisses the Indictment after Inselberg's Attorneys
    Prove the Giants' Witnesses Committed Perjury and Obstructed Justice ........................ 39

ACTUAL DAMAGES............................................................................................................... 40

COUNT ONE (New Jersey Civil RICO - *N.J.S.A.* 2C:41-1 *et seq.*) ............................................. 45

COUNT TWO (Tortious Interference with Prospective Economic Advantage).......................... 50

COUNT THREE (Tortious Interference with Contractual Relations) .......................................... 51

COUNT FOUR (Malicious Prosecution)...................................................................................... 51

COUNT FIVE (Abuse of Process) ............................................................................................... 52

COUNT SIX (Trade Libel)........................................................................................................... 53

COUNT SEVEN (Intentional Infliction of Emotional Distress) .................................................. 54

COUNT EIGHT (Unjust Enrichment)........................................................................................... 54

COUNT NINE (*Quantum Meruit*)................................................................................................. 55

COUNT TEN (Misappropriation).................................................................................................. 55

COUNT ELEVEN (Breach of Contract) ...................................................................................... 57

COUNT TWELVE (Civil Conspiracy) ........................................................................................ 58

COUNT THIRTEEN (Aiding and Abetting)................................................................................. 59

COUNT FOURTEEN (Negligent Supervision) ........................................................................... 59

COUNT FIFTEEN (Negligent Retention).................................................................................... 61

COUNT SIXTEEN (*Respondeat Superior*)................................................................................. 61

DESIGNATION OF TRIAL COUNSEL ...................................................................................... 64

JURY DEMAND............................................................................................................................ 64

CERTIFICATION PURSUANT TO *R.*4:5-1 .............................................................................. 65

DEMAND FOR DISCOVERY OF INSURANCE COVERAGE OR
INDEMNIFICATION AGREEMENTS........................................................................................ 65

## THE PARTIES

1.    Plaintiff Eric Inselberg, age 42, is an inventor and entrepreneur primarily engaged in business ventures connected with professional sports. The most significant of Inselberg's ventures, and the one in which he invested the most time and money, was creating an innovative portfolio of media-related patents that would revolutionize the way in which audiences participate and interact during live events, including, *e.g.*, football games or concerts. Inselberg is also an avid collector and reseller of sports memorabilia.

2.    Defendant New York Football Giants, Inc. (the "Giants" or the "Team"), is a New York corporation having its principal place of business, as well as the main offices for its principals, agents, and employees, at the Quest Diagnostics Training Center, 1925 Giants Drive, in the Borough of East Rutherford, County of Bergen, State of New Jersey. The Giants own and operate the professional football team known as the New York Giants, a member club of the National Football League ("NFL") since 1925 that plays its home games at MetLife Stadium in East Rutherford, New Jersey. The Giants are currently valued at approximately $1.55 billion with $338 million annual revenue, making the Giants the fourth most valuable NFL franchise and the ninth most valuable franchise in all of American sports.

3.    Defendant John K. Mara, Esq. ("Mara") is President, Chief Executive Officer, and co-owner of the Giants. Mara is responsible for all administrative, legal, and financial aspects of the organization. Prior to joining the Giants in 1991, Mara practiced law in New York City.

4.    Defendant William J. Heller, Esq. ("Heller") is the Giants' Senior Vice-President and General Counsel, a position he has held since October 1, 2010, after a 30 year career in private practice, including many years as a partner at McCarter & English, LLP, where Heller focused on intellectual property. In his role as General Counsel for the Giants, Heller is responsible for all of the team's legal affairs. He reports directly to Defendant Mara. Heller is a member of a LinkedIn

group called "Anti-Counterfeiting / Anti-Piracy Professionals."

5.     Defendant Christine Procops ("Procops") is the Giants' Senior Vice-President and Chief Financial Officer. She is a former Arthur Andersen accountant, who joined the Giants in 1994 and has been responsible for all financial aspects of the team's operations since 2001.

6.     Defendant Ed Wagner, Jr. ("Wagner") is the Giants' Equipment/Locker Room Manager, a position he has held for approximately 35 years.

7.     Defendant Joseph Skiba ("Joe Skiba") started working for the Giants as an Assistant Equipment Manager in 1994 and is currently the Giants' Equipment Director, a position he has held since 2000. He reports directly to Defendant Wagner, although he also regularly takes orders from players and coaches, and occasionally from members of the Giants' front office. Joe Skiba is in charge of, among other things, purchasing the team's equipment and uniforms.

8.     Defendant Edward Skiba ("Ed Skiba") has been an Assistant Equipment Manager for the Giants since 1996. He reports directly to his younger brother, Defendant Joe Skiba, as well as to Defendant Wagner.

9.     Defendant Eli Manning ("Manning") is the Giants' franchise quarterback. Manning was the first pick in the 2004 NFL Draft, and has since led the Giants to two Super Bowl titles, winning the MVP award each time. Manning is the highest paid player in the history of the Giants, and is currently the seventh-highest paid player in the entire NFL, having signed a seven-year $106.9 million contract extension in 2009. In addition to his player's salary, he has numerous endorsement deals including a partnership with memorabilia retailer Steiner Sports, LLC ("Steiner Sports"), a New York Limited Liability Company specializing in sports memorabilia and marketing. Manning's game-worn helmets and jerseys are currently among the most-collectible items acquired and sold by Steiner Sports. All such items sold by Steiner Sports are personally

6

authenticated as game-worn by Manning.

10. Defendant Barry Barone is the owner and operator of Defendant Park Cleaners, Inc. Since 1974, Barone has been cleaning and tailoring the uniforms for local sports teams, including the Giants (1982-present), the New York Jets (1983-present), the New Jersey/Brooklyn Nets (1980-present), the New Jersey Devils (1980-present), and the Philadelphia Eagles (2003-present).

11. Defendant Park Cleaners, Inc. ("Park Cleaners") is a New Jersey corporation with a principal place of business at 124 Park Avenue, in the Borough of Rutherford, County of Bergen, State of New Jersey.

12. John Does A-Z are other individuals and/or entities, whose identities and involvement can only be ascertained through further discovery.

## BACKGROUND

### The Sports Memorabilia Business Generally

13. In the modern sports memorabilia world, some of the most collectible items are players' uniforms and equipment. Such items fall within several general categories:

a. "Game Worn" (a/k/a/ "Game Used") – These items were actually used or worn by a player during a game. Items in this category are the most valuable and collectible, particularly if worn during an important event, such as a championship game.

b. "Game Issued" – A game-issued jersey is essentially identical to one actually worn during a game because it was prepared to be ready-to-wear, tailored to fit the specific player and adorned with whatever game-specific patches or stickers might be necessary to be worn during a game. These items are not as collectible or valuable as items actually used or worn by the players in games.

7

      c.     "Team Issued" – A team-issued jersey is one that was produced by the same manufacturer as the jerseys used by a team, but which was not yet tailored to fit any particular player or prepared for any particular game.

      d.     "Authentic" – An authentic jersey is one that was not worn in a game or created by the football team's jersey supplier, but rather is purchased on the open market at such places as the NFL.com store, or through sports equipment stores or other distributors. These jerseys were often used for NFL player signatures and/or are sold or traded with the description "authentic jersey" or some other similar moniker.

14.     The credibility of the seller is critical to the sale of game-worn memorabilia because it is often difficult if not impossible to verify the authenticity of items being sold. Credibility can be established with potential buyers by explaining the chain of custody of the item, i.e. how the seller came to possess the item. Certificates or letters of authenticity are commonly used to support the chain of custody. The absence of credibility significantly diminishes the value of game-worn memorabilia in the seller's possession.

## Plaintiff's Involvement in Sports Memorabilia

15.     Plaintiff Eric Inselberg has been an avid collector of sports memorabilia since he was a child. Inselberg's interest in sports memorabilia arose out of his love for the New York Giants—a love that dates back to October 10, 1976, when his father took him to the very first game played at Giants Stadium. In the years that followed, Inselberg amassed an impressive collection of sports memorabilia, with a focus on game-worn sports jerseys and equipment, especially all things Giants.

16.     Inselberg's passion for collecting sports memorabilia evolved from a hobby into a lucrative business. By the mid-2000s, Inselberg gradually began to arise as one of the foremost

8

sports memorabilia collectors and resellers in the nation.

17. Prior to October 2011, Inselberg operated a profitable business selling unique and authentic sports memorabilia. Inselberg formed two companies for his sports memorabilia purchases and sales, Pasadena Trading Corp. and Taylor Huff, Inc. Neither of these companies consisted of a physical store, but rather, were entities utilized for Inselberg's sports memorabilia business transactions. Both companies are now defunct.

18. Inselberg obtained game worn memorabilia through numerous channels, including direct acquisitions from many current and former professional athletes, as well as sports teams' uniform cleaners and equipment managers. He also acquired game-issued and authentic items, both for his personal collection and for re-sale.

19. Inselberg's largest supplier, by far, was the Giants via their equipment management staff, in addition to several players. Beginning in the 1990's and continuing through the early 2000's, Inselberg developed a business relationship with Defendant Wagner, from whom Inselberg purchased hundreds of items. Beginning in or about 2001, Inselberg developed a business relationship with Wagner's subordinates, Defendant brothers Joe Skiba and Ed Skiba (collectively, the "Skibas"), from whom Inselberg ultimately purchased thousands of items over the ensuing decade. Inselberg also developed a personal friendship with the Skibas, particularly Ed Skiba.

20. By 2006, the Giants' management was aware of the full scope of Inselberg's relationship with the Giants' equipment staff, after Inselberg provided documentation of the relationship, such as letters, invoices and receipts to the Giants' Field Security Manager, Terry Mansfield, who communicated this information to Defendants Mara and Procops. Inselberg provided this documentation at the request of Joe Skiba, who was hoping to improve his position in the equipment room.

9

21. At all times when Inselberg was acquiring memorabilia, the Giants had no official policy in place with regard to the distribution of used or damaged jerseys and equipment.

22. Inselberg was first introduced to Wagner by a fellow memorabilia collector, and by Barry Barone of Park Cleaners, who handled the dry cleaning and maintenance of the uniforms for the New York Giants, as well as the New York Jets, the New Jersey Nets, the New Jersey Devils, and the Philadelphia Eagles. Inselberg purchased game-worn sports memorabilia from each of those teams through Park Cleaners. Many of Inselberg's transactions with the Giants' equipment staff were made on Park Cleaners' premises, or otherwise facilitated by Barone, who typically earned a commission on all of Inselberg's memorabilia transactions with the Giants.

23. Through the Skibas, Inselberg was introduced to other teams' equipment managers, from whom Inselberg was able to acquire those other teams' game-worn memorabilia. The Skibas also sold other NFL teams' game-worn memorabilia to Inselberg directly, after having acquired items from other teams themselves. Such items sold directly to Inselberg included, among other things, NFL star players' jerseys and Pro Bowl helmets.

24. Acquiring sports memorabilia from equipment staff as Inselberg did was standard practice among professional sports teams. Moreover, Inselberg's acquisition of memorabilia from the Giants has been ratified by the Giants' management as legitimate.

## Plaintiff's Other Business Ventures

### The Football Helmet Design Patents ("Helmet Patents")

25. Beginning in or about 2003, Plaintiff partnered with Joe Skiba (and, to a lesser extent, Ed Skiba) to develop an improved football helmet that would reduce the occurrence of traumatic brain injuries, which have plagued NFL players, though the long-term symptoms of such injuries often do not present until many years after retirement from the NFL. Inselberg and Skiba

together obtained two patents on such an improved helmet. (Patent Nos. 6,931,671 and 7,062,795).

Third party tests concluded that their design was a significant improvement over existing helmets

on the market, including those used by the NFL.

26.     Inselberg invested approximately $200,000 into the business venture.

27.     In connection with the business venture, Inselberg provided a line of credit to Joe

and Ed Skiba in the amount of $100,000.

28.     Inselberg's involvement in this business venture with the Skibas was disclosed to

the Giants prior to the filing of any patent applications.  According to Joe Skiba, he contacted

Christine Procops to obtain permission to work on the helmet endeavor, and she approved his

involvement in the project.

29.     In or about late 2011, Joe Skiba ceased to communicate with Inselberg entirely.

Since May 2013, Inselberg has made numerous unsuccessful attempts to contact Joe Skiba to

discuss the helmet patent business.

30.     Upon information and belief, Joe Skiba cut off communications with Inselberg based

on explicit or implicit instructions from the Giants' management, including the CEO, John Mara,

and the General Counsel, William Heller.

31.     The termination of communication between Inselberg and Joe Skiba effectively

terminated the entire business venture.  Without Skiba's ongoing involvement, Inselberg could not

justify continuing to pay the fees necessary to maintain the active registration of the Helmet

Patents.  Accordingly, in or about August 2013, Inselberg did not pay the required maintenance

fee, and the Helmet Patents terminated as a result.

### The Wireless Audience Participation Patents ("Wireless Patents")

32.    Beginning in or about the mid- to late-1990s, Inselberg began researching and developing methods for audience participation at live events.  At the time, the technology did not yet exist to implement these methods, much less to profit from them.  Nevertheless, in or about 2000, Inselberg began obtaining patents on the methods he invented.  By the late 2000s, contemporaneous with the rise of the ubiquitous smartphone, the requisite technology finally existed, and Inselberg had obtained numerous patents to protect the rights to his invention.  Inselberg created a separate entity, Inselberg Interactive, LLC ("Interactive"), which became the registered owner of the patents.

33.    Attached as Exhibit A is a chart that compiles the patents referred to in this section.

34.    Interactive actively marketed its patent portfolio, which offered at least three potentially significant revenue streams:  (1) using the patent rights to offer unique marketing services to live event venues; (2) directly licensing the patents to live event venues; and (3) litigating against infringing parties (including live event venues and related businesses, as well as advertisers and service providers).

35.    In or about 2010, Interactive promoted itself as a marketing company for live event venues and the franchises that utilize them.  It presented its services as a product called "Tapt-In." As the Tapt-In presentation materials showed, it bridged the gap between Interactive's patent portfolio and real-world marketing to help potential licensees capitalize on the significant yet substantially untapped marketing potential of having a captive audience, almost every member of which was capable of being reached wirelessly through their smart phones.

36.    At all relevant times, Inselberg held an 82.5 to 87.5 percent ownership interest in Interactive.

37.     Inselberg invested over $2.6 million ($2,600,000.00) into developing the patent portfolio and the Interactive business venture.

38.     In or about 2007, Interactive was offered ten million dollars ($10,000,000.00) by a third party patent aggregation and monetization company to acquire Interactive's entire patent portfolio. Interactive rejected the offer.

39.     In or about August 2010, Interactive entered into a loan agreement with Frank Bisignano (hereinafter the "Bisignano Loan"). Bisignano was then the Co-Chief Operating Officer for JP Morgan Chase and CEO of Mortgage Banking at JP Morgan Chase. The Bisignano Loan was collateralized by, *inter alia*, Interactive's patent portfolio.

40.     On or about December 20, 2010, Interactive engaged the legal services of one of the top intellectual property law firms in the country, on a contingency fee basis, in an attempt to license the patents to live event venues and related businesses, or, if necessary, to litigate against infringing parties. The law firm terminated the attorney-client relationship in or about mid-2012.

41.     Interactive defaulted on the Bisignano Loan in or about April 2012. Although the lender graciously allowed Interactive many months of extra time to attempt to get out of default, Interactive was unable to do so. As a result, in or about January 2013, Inselberg was forced to authorize the transfer of the Interactive patent portfolio to Bisignano. The transfer was made effective as of April 2012, the date of the original default.

## Plaintiff's Relationship with the Giants' Management

42.    Over time, Plaintiff's relationship with the Giants expanded beyond his dealings with the equipment staff to include working directly with the team's management on a number of projects.

## The Legacy Club

43.    Inselberg was instrumental in creating the Legacy Club, the crown jewel of the Giants' fandom at the new MetLife Stadium where the Giants play their home games.

44.    The Legacy Club is the Giants' historical museum, containing game-used memorabilia from historic games throughout the history of the New York Giants. The multi-room display is prominently located at the stadium for the enjoyment of all Giants fans.

45.    In total, the Legacy Club contains memorabilia valued at approximately over $1,000,000.00, almost all of which was generously loaned by Inselberg to the Giants free of charge from his own personal collection accumulated over his entire life.

46.    Among the items of game-worn memorabilia in the Legacy Club are numerous items Inselberg obtained from Wagner and the Skibas.

47.    In September 2010, the Legacy Club opened to great fanfare. As a person who prefers privacy, Inselberg asked the Giants to refer to him in public as simply an "anonymous donor." Internally within the Giants organization, however, Inselberg received the title of "Giants Memorabilia Curator." He had put in countless hours of work preparing the Legacy Club and its displays of his memorabilia for all of the other Giants fans to enjoy.

48.    Around the same time that the Legacy Club was opening, Defendant Procops maliciously and without any foundation initiated an assault on Inselberg's reputation by telling multiple people within the Giants' organization that Inselberg's memorabilia was fake or stolen.

14

49.     Inselberg had previously met with the Giants' owners and managers and explained to them the various means by which he acquires memorabilia, including the fact that he had received a significant quantity of items from the Giants' current and former staff members. On or about September 22, 2010, John Mara wrote to Inselberg, stating:

> On behalf of the Mara and Tisch families, I wish to thank you for loaning the Giants organization your extensive collection of Giants memorabilia. Your collection has made the Legacy Club a fan favorite destination in the new stadium .... Thank you again for your support. We look forward to working with you in the near future on the Timex Performance Center memorabilia displays.

## Wireless Marketing

50.     At the request of the Giants' Chief Marketing Officer, Mike Stevens, Inselberg Interactive presented its "Tapt-In" in-stadium wireless advertising service to the Giants over the course of several meetings in or about the fall of 2010. The Giants were very interested in the potential value to be realized by licensing Interactive's patent portfolio, especially because the concepts and technologies presented were essentially brand new potential profit centers, about which the Giants had little or no previous knowledge.

51.     The Giants did not ultimately acquire any licenses or other services from Interactive. The Giants nevertheless proceeded to implement many of the marketing methods that Inselberg and Interactive had presented to the Giants, without providing any form of compensation to Inselberg or Interactive.

52.     Stevens was so impressed by Inselberg's creativity and knack for marketing that he invited Inselberg to numerous additional meetings simply to pick his brain for potential marketing and promotional ideas. Many of those ideas were implemented by the Giants without providing any compensation to Inselberg.

## Chase Banking Deal

53.     Acting on behalf of the Giants, Inselberg initiated contact with JPMorgan Chase executive Frank Bisignano, who was Inselberg's personal friend and a financier for Inselberg Interactive. Inselberg initiated contact with the goal of establishing JP Morgan Chase as a major sponsor in connect with the Giants'/Jets' new stadium. Inselberg participated in numerous meetings and conversations to facilitate the start of serious negotiations.

54.     During the negotiations but prior to any deal closing, Giants' executive Mike Stevens gave Inselberg a pair of Tiffany glasses as a gesture of gratitude. Inselberg accepted the gift but responded by raising the issue of receiving a commission (i.e. a finder's fee) for his work. Inselberg added that he understood that a fee of three percent (3%) of the deal value was standard for similar deals. Stevens acknowledged Inselberg's entitlement to a fee if a deal was reached, and promised to compensate Inselberg for his services. Specifically, Stevens stated, "First of all, Eric, let's get a deal done. Then we'll worry about it. You are part of the Giants' family. We'll take care of you." Even though the cash amount of the commission was not specified at the time, Stevens did promise that part of Inselberg's compensation would include a 2007 Super Bowl ring for his personal collection of Giants memorabilia.

55.     The discussions initiated by Inselberg resulted in Chase being installed as the official bank for the Giants. Upon information and belief, this banking deal resulted in tens of millions of dollars of revenue for the Giants and their affiliated entities.

56.     The Giants have failed to provide any of the promised compensation to Inselberg for his services rendered and the substantial benefits the Giants received as a result.

## The Government Investigation of Game-Worn Jersey Fraud

57.     In or about the 2006, the United States Attorney's Office for the Northern District of Illinois in conjunction with the FBI (together, the "Government"), commenced a criminal investigation into fraud in the sports memorabilia business. Specifically, the Government was concerned that individuals were fraudulently misrepresenting jerseys as game worn when they had never actually been worn during a game.

58.     In order to prove that a particular individual was engaged in such fraudulent activity, the Government sought to determine two numbers: (1) the number of game-worn jerseys that the individual could have obtained from sports teams, and (2) the number of jerseys sold by the individual which he had represented to be game worn. If the Government could show that an individual had sold more supposedly game-worn jerseys than he had obtained from legitimate sources, the Government was able to prove that some of the jerseys sold were not game worn as claimed. This showing was essential for the Government to obtain an Indictment from the Grand Jury against any particular individual.

59.     In or about 2008, the Government learned that Inselberg may have sold game-issued or authentic jerseys to other memorabilia traders that were ultimately sold—fraudulently—as game-worn. The Government began investigating Inselberg to determine whether he was a knowing participant in such fraud.

60.     Beginning in or about May 2010, the Government began contacting Giants' vendors and employees in order to determine whether Inselberg had in fact received a massive amount of memorabilia from the Giants' equipment staff, as he claimed.

61.     As discussed in more detail below, the Giants' employees repeatedly lied to the Government about their relationships with Inselberg. Most damagingly, these employees

17

knowingly understated the amount of memorabilia they had sold to Inselberg. Those lies created a false discrepancy between the number of legitimate jerseys obtained by Inselberg and the number of legitimate jerseys sold by Inselberg. That discrepancy directly and proximately caused Inselberg to be wrongly indicted for mail fraud.

## THE DEFENDANTS' MISCONDUCT

62. The Government's investigation had the potential to deal severe damage to the Giants' public image, as several Giants employees had themselves engaged in memorabilia fraud. That fraud was generally committed for personal gain and out of cold indifference to the importance that fans and memorabilia collectors place on authentic pieces of sports history. Accordingly, when the Government came knocking on the Giants' door, the response was a cover up that threw Inselberg under the bus to protect themselves and the team.

### Lies during the Government Investigation

63. During the course of the Government's investigation of Inselberg, the FBI interviewed at least four witnesses affiliated with the Giants: Defendants Barone, Wagner, Joe Skiba, and Ed Skiba (collectively referred to as "the Giants' witnesses").

#### Barry Barone

64. Defendant Barone was first telephonically interviewed by the FBI on May 6, 2010. During the interview, Barone stated that Inselberg had asked him whether he could get game-used Giants or Jets jerseys, but Barone claimed to have refused Inselberg's request. This statement was absolutely false.

65. Furthermore, Barone told the FBI about how Inselberg would letter, number and alter Giants jerseys at Park Cleaners, and that those jerseys did not appear to be game-used. Barone claimed that Inselberg told him that the jerseys he was having heat sealed at Park Cleaners were

18

for his own personal collection of football jerseys. In light of Barone's claim that Inselberg did not obtain game-used jerseys from Barone, these statements made it appear that Inselberg was creating fraudulent Giants jerseys for sale to third parties. To the contrary, Inselberg was lettering, numbering and altering Giants jerseys to give those jerseys *to the Giants*—indeed, those were *replacement* jerseys for the game-used jerseys that Inselberg took out of Barone's laundry bins after home games.

66.    Additional false statements were made by Barone during the May 6, 2010 interview, including but not limited to:

a.    Barone claimed that he was introduced to Inselberg by Joe Skiba. In fact, it was Barone who formally introduced Inselberg to the Skibas for purposes of dealing in memorabilia.

b.    Barone falsely denied having given Inselberg permission to place many orders with Barone's vendors.

c.    Barone claimed that he never gave a Giants or Jets jersey to anyone, despite having been asked to obtain them by a number of people throughout the years.

67.    Barone was telephonically interviewed by the FBI at least two more times, on May 7, 2010 and June 1, 2010. Upon information and belief, Barone made additional false statements about his business dealings with Inselberg and other memorabilia collectors during those interviews.

68.    Upon information and belief, Barone's false statements to the FBI substantially and directly influenced the Government's decision to investigate Inselberg more closely in or about September 2010.

## Edward Wagner

69.     The Government interviewed Wagner by telephone on or about February 11, 2011.

During the interview, Wagner claimed to have never sold Inselberg any sports memorabilia. The

FBI's investigation report from the interview states:

> It is rare that true game used Giants jerseys get out into the market
> place. The Giants organization frowns on the sale of game used
> jerseys by their players. The Giants organization does not allow
> WAGNER or any of his assistants to take or resell game used
> items. WAGNER believes that if an individual were caught
> stealing game used items from the team, that individual would face
> termination.

70.     The FBI's report of Wagner's interview also states:

> WAGNER  never  sold  or  gave  game  used  items  to
> INSELBERG. WAGNER never acted as a broker to get game
> used items for INSELBERG.

71.     Wagner's statements were false, as he has been involved in selling game used

merchandise through himself, Barone, and others since at least the mid 1990's. Inselberg provided

234 photographs and other evidence to the Government documenting just a portion of the massive

quantity of game-worn memorabilia obtained through Wagner over the course of several years.

72.     Upon information and belief, Wagner has been involved in selling Giants game-

worn memorabilia since he first started working with the Giant. Indeed, Wagner's father—Ed

Wagner, Sr., who also worked for the Giants—did the same thing, and Wagner continues to sell

Giants game-worn memorabilia through unofficial channels to this day.

73.     The false information that Wagner provided the FBI regarding the breadth and scope

of Inselberg's access to game-worn memorabilia, substantially contributed to the Government's

inaccurate impression of Inselberg's game-used memorabilia collection and directly influenced

the Grand Jury's decision to indict.

## Joe Skiba

74.    Joe Skiba was first telephonically interviewed by the FBI on February 14, 2011.

According to the FBI investigation report, he adamantly denied ever selling or providing game

used memorabilia to Inselberg:

> [Joe] SKIBA has never provided a piece of game used equipment to
> INSELBERG. SKIBA has told INSELBERG "you can't ask me to get you
> anything." SKIBA has never obtained game used equipment from other
> teams   or from other team's Equipment Managers for himself or for
> INSELBERG. SKIBA then said "you never want to do that." When asked
> why, SKIBA said, that is just something you do not want to start doing.
> When told that according to a number of witnesses, INSELBERG has told
> people that he obtained game used items from SKIBA and ED SKIBA,
> SKIBA said that INSELBERG's statements were not true. SKIBA said that
> if he were to provide INSELBERG with game used items, that would make
> more of a workload for him because he would then have to order new items
> to replace the ones that he gave INSELBERG. SKIBA does not know why
> INSELBERG would say such a thing because it is not true. SKIBA then
> said that it would be "flat out wrong" for INSELBERG to say that he
> obtained game used items from or through SKIBA and his brother ED
> SKIBA.

In the same interview, Joe Skiba also denied knowing if Inselberg had any connection with Barone

and Park Cleaners. These statements were absolutely false.

75.    In the same interview, Joe Skiba asserted that "it would be impossible for anyone to

collect hundreds of jerseys in a year." This statement, too, was false, as Skiba well knew, having

been personally involved in providing approximately 500 to 600 Giants jerseys to Inselberg each

year for several years, including at least 275 game-used Giants jerseys during each of those years.

76.    When Joe Skiba was subsequently interviewed by the FBI on October 24, October

25, and November 1, 2011, he admitted to providing Inselberg with game used jerseys and other

memorabilia. He essentially stated that he was selling memorabilia to Inselberg since 2002 or

2003 and he was paid with cash and checks. Joe Skiba, however, did not come clean and tell the

whole truth. Although he now admitted that he provided Inselberg with memorabilia, Skiba

21

continued to lie about the scope, quantity and types of memorabilia.

77.    The following statements made by Joe Skiba to the FBI, among many others, were false or materially misleading:

  a. <u>10/24/2011 Interview</u>:

    The largest in-season transaction SKIBA and INSELBERG conducted was for between eight and ten jerseys. The largest off-season transaction, SKIBA and INSELBERG conducted was for between twelve and fifteen jerseys.

  b. <u>10/25/2011 Interview</u>:

    SKIBA never called other NFL team equipment managers to ask for jerseys on INSELBERG's behalf.

  c. <u>11/1/2011 Interview</u>:

    SKIBA only provided INSELBERG with GIANTS items during their relationship.

**Ed Skiba**

78.    Ed Skiba was first interviewed by the FBI on or about February 15, 2011.  Like his brother Joe, Ed Skiba lied about providing memorabilia to Inselberg.  Among other things, Ed Skiba stated:

    SKIBA has never taken or obtained items (jerseys, helmets or balls) from the Giants locker room for others. SKIBA is not aware of anyone on the Giants staff ever taking or obtaining items (jerseys, helmets or balls) from the Giants locker room for others. SKIBA has never taken or obtained items (jerseys, helmets or balls) from other teams for other individuals. SKIBA is not aware of anyone on the Giants staff ever taking or obtaining items (jerseys, helmets or balls) from other teams for other individuals.

79.    On March 3, 2011, Ed Skiba changed his previous statements and stated that he has been providing game used items to Inselberg since 2003 or 2004. Like his brother Joe, Ed

Skiba continued to provide false information. Specifically, he materially understated the amount of memorabilia provided to Inselberg.

80.     Ed Skiba continued to understate the amounts and types of memorabilia provided to Inselberg during subsequent FBI interviews on or about October 24 and 25, 2011.

81.     The following statements made to the FBI, among others, are false:

a.   <u>March 3, 2011</u>:

SKIBA then stated that INSELBERG would typically ask him for approximately four jerseys after every game and on average SKIBA was able to obtain two of the four requested jerseys.

b.   <u>March 3, 2011</u>:

SKIBA never took INSELBERG to PARK CLEANERS

c.   <u>October 24, 2011</u>:

SKIBA believes that his largest jersey transaction with INSELBERG could have involved between 20 and 50 jerseys. A transaction involving between 20 and 50 jerseys would have occurred at the end of the season and would have involved game issued Jerseys.

d.   <u>October 25, 2011</u>:

SKIBA was not aware of EDWARD WAGNER, head equipment manager for the Giants selling items to INSELBERG.

82.     Upon information and belief, the impetus for Ed Skiba changing his statements in March 2011 was a submission made by Inselberg to Defendants Heller and Mara. Defendant Heller, realizing that Inselberg had evidence that would prove that Ed Skiba had deceived the FBI agent, instructed Ed Skiba to alter his statements just enough to avoid being refuted by the evidence that Heller knew Inselberg had.

23

83. Upon information and belief, Heller and Mara were unaware that Inselberg had significantly more evidence of purchases from the Skibas than had been provided to Heller and Mara.

## The Giants' General Counsel Worked Tirelessly to Insulate the Giants from the FBI Investigation and Potential Negative Publicity

84. It is no mere coincidence that all four individuals affiliated with the Giants lied to the FBI. To the contrary, upon information and belief, these witnesses were coerced, convinced, manipulated, persuaded, instructed, and intimidated into lying by the Giants' own General Counsel, Defendant Heller, who was concerned about the potential fall-out should Giants employees and vendors be implicated in misconduct by Inselberg.

85. Upon information and belief, Heller became involved in preparing the Giants' response to the Government investigation prior to February 2011. The Government's investigation was likely to have been particularly distressing to Heller because he was so new at his job, having only started in October 2010. It is likely that Heller would have been blamed should any significant damage to the Giants' brand or public image have occurred so soon during his watch.

86. Heller was personally involved in preparing witnesses to be interviewed by the FBI, and he participated in several of the FBI's interviews. Heller also retained his old law firm, McCarter & English, to act as the Giants' outside counsel. Heller and outside counsel also conducted an internal investigation, the results of which were reported to John Mara in or about the summer of 2011.

87. Heller and the Giants' outside counsel spoke over the phone with the lead investigating FBI agent and Assistant U.S. Attorney on multiple occasions between February and October 2011, separate and apart from the specific witness interviews detailed above.

88. Upon information and belief, during witness preparation meetings and interviews conducted during the course of the Giants' internal investigation, Heller attempted to convince the witnesses that they had to distance themselves from Inselberg, and thus discredit Inselberg's claim that the Giants were a significant source of game-used memorabilia. Heller accomplished this, in part, by repeatedly suggesting that Inselberg was guilty of fraud and warning the witnesses that failure to distance themselves from Inselberg would result in their facing criminal charges as well. Heller explained that the only way to avoid facing charges themselves was to make sure that the Government's focus remained on Inselberg.

89. For example, Heller made the following misleading, intimidating, and manipulative statements to Joe Skiba:

a. "I don't mean to put a wedge between your guys' friendship, but if Inselberg goes out there and throws you guys under the bus, there is not much we can do about it."

b. "Inselberg is going to turn on you."

c. "Eric [Inselberg] is going to take you down. Eric is going to take you down."

d. Heller claimed Inselberg had told the FBI "everything," even though Inselberg had, in fact, declined to be interviewed.

90. Heller repeatedly threatened the Skibas with "punishment" for having sold memorabilia to Inselberg, even though no policy had prevented them from doing so, and even though Wagner had been engaged in such sales long before the Skibas ever started working for the Giants. Specifically, Heller threatened to have the Skibas fired and/or to make them pay the Giants for the full value of the items that they had sold.

91. Upon information and belief, Heller promised the Skibas that they would not be punished for having sold Giants' memorabilia to Inselberg so long as they did as Heller instructed

25

them to do when speaking to the Government.

92.    Once he successfully convinced the witnesses that they had to lie to save themselves and their jobs, Heller proceeded to dictate specifically what the witnesses should say regarding the volume of the witnesses' memorabilia sales to Inselberg. For example, Heller told the Skibas, "That's for us [the Giants' management] to worry about. We're going to put our heads together and figure out what we are telling them [the Government]." On another occasion, Heller explained, "We'll prepare you for the questions they're going to ask you in front of the Grand Jury; just answer the way we want you to answer them, and then that's it."

93.    The way the Giants wanted the witnesses to answer, according to Heller, was to say that the amount of memorabilia sold to Inselberg was significantly less than it actually had been. Heller additionally instructed the witnesses that it was their responsibility to ensure that the Giants avoided adverse publicity associated with being the potential subject of the Government's investigation.

94.    The witnesses believed that they would lose their jobs if they retained independent counsel. The result was that the witnesses relied solely upon the Giants' attorneys, including Heller, every step of the way.

95.    The fact that Heller and the Giants' outside counsel were the only attorneys working with the Skibas posed, in Heller's own words, "an ethical dilemma." According to the FBI report of the February 15, 2011 interview of Ed Skiba, the following transpired at the end of the interview:

> When [the FBI agent] began to ask questions related to checks written by INSELBERG with notations such as "Footballs, Giants jerseys and Tiki" HELLER asked SKIBA to step out of the room. HELLER then said that he needed to terminate the interview because it appeared that he may be putting himself in an ethical dilemma because he represents the Giants and not SKIBA. HELLER said that he would contact [the FBI agent] at a later date after determining what he needed to do on behalf of his client, the Giants.

96.    Upon information and belief, Heller's main reason for cutting the interview short was that he realized Ed Skiba had been caught in a lie. Just moments before being confronted by the FBI agent with the fact that Inselberg had written checks to Ed Skiba that were expressly for "Giants jerseys," Ed Skiba had stated that he "has never sold or given a Giants helmet or jersey to anyone."

97.    Heller's description of an "ethical dilemma," however, severely understated the real and significant conflict of interest that existed once it was apparent that the Skibas' interests diverged from those of the Giants. Nevertheless, Heller continued to advise and counsel Ed Skiba and his brother in connection with the Government's investigation.

98.    During the course of the Government's investigation of Inselberg, Heller spoke on several occasions with Inselberg's attorney. Heller made numerous statements to the effect that, insofar as he was participating in the Government's investigation, his primary concern was to protect the Giants. Upon information and belief, it was this concern that motivated Heller to attempt to influence the witnesses' statements to the FBI.

99.    Heller directed others within the Giants organization not to have any contact with Inselberg because, as Heller proclaimed, Inselberg was a fraudster who could not be trusted. In fact, all that Heller knew was that any continued association with Inselberg could damage the Giants' reputation. Heller threatened to fire people if they failed to follow his instruction to cut ties with Inselberg.

100.    In or about late February 2011, Inselberg reached out directly to Heller in an attempt to show Heller that he was innocent of the charges because he had obtained all of his memorabilia through legitimate sources, including specifically the Giants' equipment staff. He sent a detailed letter to Heller, copied to John Mara, in which he provided documentary evidence of both his

27

business and personal relationships with the Giants' equipment staff, particularly Wagner. In that letter, Inselberg states, "Disparaging and untrue remarks by Ed Wagner and the Agent in which they have tried to embarrass, discredit and slander me is causing a great deal of anxiety and distress. My hope is that you will look at all the facts and provide me the opportunity to tell my side of the story in its entirety." Accompanying that letter, were numerous supporting documents showing Inselberg's involvement with the Helmet Patents, and documenting Inselberg's purchases from Wagner.

101. As detailed above, just days prior to Inselberg sending this letter, Ed Wagner and the Skibas gave false statements to the FBI essentially claiming that they had never sold *any* memorabilia to Inselberg.

102. Upon information and belief, when Heller received Inselberg's February 21, 2011 letter, he realized that the supporting evidence clearly established that the Skibas had sold at least *some* memorabilia to Inselberg. Prior to allowing the Skibas to speak with the FBI again, Heller convinced the witnesses to change their stories to admit that they had sold some memorabilia to Inselberg, in order to avoid the FBI agent deciding to take a closer look at the Skibas and, in turn, the Giants. Nevertheless, consistent with Heller's express or implied instructions, the Skibas' subsequent statements significantly understated the volume of memorabilia sold to Inselberg.

103. On or about March 22, 2011, Heller, along with the Giants' outside counsel, met with Joe Skiba and, *inter alia*, sought to convince him that the Helmet Patents endeavor was a "sham" project, and that loans and payments made in connection with the endeavor were really payments for memorabilia. Though Joe Skiba initially resisted Heller's mischaracterization, he eventually capitulated and agreed to say that the arrangement was a "sham."

104. Upon information and belief, Barone directly and indirectly confederated and conspired with employees of the Giants to determine what he would say to the FBI and, as detailed below, to the Grand Jury as well.

## Perjury before the Grand Jury

105. The only three fact witnesses called to testify before the Grand Jury that was investigating Inselberg were Defendants Barone, Ed Skiba, and Joe Skiba. All three witnesses committed perjury.

106. An investigating FBI Agent also testified before the Grand Jury, and his testimony was substantially based on false or misleading information provided by Defendants Heller, Barone, Wagner, and the Skibas.

### Barry Barone

107. Barone testified before the Grand Jury on October 11, 2011. During the Grand Jury appearance, the Government once again sought information concerning any relationship between Barone and Inselberg pertaining to game-used jerseys. The following question and answer ensued:

> Q:   Okay. Did you have any reason to believe that Mr. Inselberg was involved in the buying and selling of game-used jerseys?
>
> A:   No, sir.

108. During the Grand Jury appearance, the Government also allowed Barone to review the previous FBI investigation reports page by page for purposes of making any corrections to the FBI agents' reports. In discussing page two of the initial report where the agent wrote that "INSELBERG did ask BARONE if he could get him game used GIANTS or JETS jerseys, but BARONE told him no," the following occurred:

> Q:   Okay. All right. And let me speed it up a little bit, do you have any more changes or alterations on that page?

29

A:   Not on that page, no, sir.

109.   Barone's Grand Jury testimony was materially and intentionally false, and thus constituted perjury. If the Grand Jury had been presented with anything close to the full scope of transactions Inselberg conducted with Barone and at Park Cleaners, the Grand Jury would have been extremely unlikely to indict Inselberg.

110.   Upon information and belief, Barone's Grand Jury testimony included numerous additional false statements regarding his relationship with Inselberg and his involvement in the trade and distribution of sports memorabilia generally. Barone perjured himself in order to protect the Giants from the FBI's scrutiny and negative media exposure, as well as to protect himself and his business, Defendant Park Cleaners. Barone did so with the knowledge and awareness that his actions would make it appear as though Inselberg was dishonest about where he obtained the majority of the memorabilia that he sold and would thus likely result in Inselberg's Indictment.

111.   Upon information and belief, Barone confederated and conspired with the Giants and others to provide a consistent but materially false story to the Grand Jury. Barone's perjury was caused by Defendant Heller, directly through communications with Heller, indirectly through discussions with Wagner and/or the Skibas, or both.

112.   Upon information and belief, Park Cleaners' ability to continue its lucrative relationship with the Giants was expressly or implicitly conditioned upon Barone providing false statements and testimony that was favorable to the Giants but detrimental to Inselberg, and upon ceasing any and all contact with Inselberg.

## Joe Skiba

113.   Joe Skiba testified before the Grand Jury on or about October 25, 2011. He lied to the Grand Jury by, among other things, dramatically understating the volume of memorabilia he provided to Inselberg in a typical year. For example, Joe Skiba testified as follows:

Q:      Okay. At the time that it leveled out, and for however many years
        it was leveled out, approximately how many jerseys would you
        have sold to Mr. Inselberg in a year?

A:      So if it was, so on a high end, if it was 22 starters, 25 players
        whatever, you know, give or take, one of each color, 50 jerseys,
        and maybe a little over 50 jerseys I would say, give or take like I
        said, he'd want the starters, you know, one of each color, then you
        know -

Q:      And would that be for any 12 month period?

A:      No, most of the time we dealt with him was kind of around the
        football season.

Q:      Okay. And so, in terms of 50 or a few more, would that be the
        number that you sold throughout the course of the season?

A:      Yeah, I mean, when I said cap, yeah, then it would be.

Q:      All right. In addition to uniforms or equipment, did you sell
        anything else to him?

A:      No.

114.    Joe Skiba perjured himself to the Grand Jury and made false statements to the FBI

as part of a concerted effort to minimize the amount of game worn jerseys and other memorabilia

sold to Inselberg. For example, as recently as 2012, Inselberg was in possession of more than

150 game-worn jerseys obtained from the Skibas in 2007 alone, including approximately 28

jerseys obtained in one transaction from the inaugural London Game held at Wembley Stadium

in 2007 between the New York Giants and the Miami Dolphins. Additionally, the Skiba brothers

sold Inselberg more than 35 Giants red jerseys worn during the 2007 Giants-Cowboys home

game.

115.    Upon information and belief, Joe Skiba's Grand Jury testimony included

numerous additional false statements regarding his involvement in the trade and distribution of

31

sports memorabilia and his relationship with Inselberg, including lies about the nature of the Helmet Patent endeavor and the related line of credit by telling the Grand Jury that the moneys he received from Inselberg pursuant to the line of credit were payments for memorabilia instead.

116.   Upon information and belief, Joe Skiba perjured himself and misled the Grand Jury based upon explicit or implicit instructions from the Giants' General Counsel, William Heller, Equipment Manager Ed Wagner, and others. Joe Skiba wanted to protect the Giants from the FBI's scrutiny and negative media exposure.

### Ed Skiba

117.   Ed Skiba testified before the Grand Jury on October 25, 2011. Like Barone and his brother, Ed Skiba also lied to the Grand Jury by, among other things, dramatically understating the volume of memorabilia he provided to Inselberg in a typical year. For example, during the Grand Jury appearance, the following questions and answers ensued:

Q:   In 2007, approximately how many jerseys would you have transferred to Mr. Inselberg?

A:   I mean, there would be games where he would maybe ask for like 12 players after a game, but I mean, if a player took their jerseys then that number would go down. I mean, there would be games where he's only ask for four.

Q:   Okay.

A:   But, you know, I mean he would be like, depending on the availability, you know, can you get me these. Approximately, I mean, like I said, I never kept track, so I mean, I I could have a number, but.

Q:   Would you say that there were very many years that it would have exceeded 50 jerseys?

A:   Yes, yes.

Q:   Okay. Would you say that there were very many years that it would have exceeded 75?

> A:    Maybe, I mean, but if you're going to put a guard on it, I would say
> maybe 50 to 75, I mean, that would probably be an average.

118.    Upon information and belief, Ed Skiba's Grand Jury testimony included numerous additional false statements regarding his relationship with Inselberg and his involvement in the trade and distribution of sports memorabilia generally. Ed Skiba perjured himself and misled the Grand Jury based upon explicit or implicit instructions from the Giants' General Counsel, William Heller, Equipment Manager Ed Wagner, and others. Ed Skiba wanted to protect the Giants from the FBI's scrutiny and negative media exposure.

## The Giants' Involvement in Game-Used Memorabilia Fraud

119.    A significant reason why the Giants deceived the federal investigation and the Grand Jury was because of their own long-standing involvement in game-used memorabilia fraud.

120.    In or about 2001, Wagner directed Barone to intentionally damage multiple Giants jerseys to make them appear to have been game-worn when they had not been. Inselberg discovered this when he walked into the Park Cleaners store and caught Barone in the act of doctoring jerseys. Barone explained that the fraudulently altered jerseys were not intended for Inselberg, but for an unidentified third party. Barone swore to Inselberg that he had never committed fraud in connection with anything that ended up in Inselberg's possession.

121.    Upon discovering Wagner's fraud, Inselberg decided to exercise caution and cease doing business with Wagner. Barone acknowledged Inselberg's desire to work with someone at the Giants other than Wagner, so he and his spouse, Kathy Barone, connected Inselberg with Joe Skiba at their Park Cleaners store for purposes of continuing the Giants memorabilia relationship that had been so profitable for Barone.

122.    According to admissions he made to Inselberg, Joe Skiba has created fraudulent memorabilia at the direction of the Giants' management and players. Chief among those players

is the team's starting quarterback, Defendant Eli Manning, who has on several occasions directed Skiba to take non-game-worn helmets and make them appear to have been worn so that Manning could pass them off as the actual helmets worn by him during games. Manning typically gives helmets that he claims to be game-worn to Steiner Sports.

123.    Upon information and belief, Manning has an exclusive contract with Steiner Sports. Among other things, this contract requires Manning to give his game-worn memorabilia to Steiner Sports. Moreover, this exclusive contract is public knowledge, and the Giants' owners and management are aware of Manning's contract and the fact that he regularly provides allegedly game-worn memorabilia to Steiner Sports. The Giants' owners and management have long known that Manning and other players routinely take Giants uniforms and equipment in order to sell the items for personal profit without providing compensation to the Giants.

124.    Upon information and belief, in or about 2005, Defendant Manning instructed Joe Skiba to provide him with a helmet that appeared to have been worn in a game. Skiba did as directed, and Manning took the helmet, signed it, and placed it into the market, falsely claiming that it was a helmet used during his 2004 rookie season. In or about November 2013, that same helmet was listed for sale by a prominent memorabilia auction house. It is unknown whether or not that helmet was actually sold to some unwitting buyer, because the listing has since been removed from the auction house's website.

125.    In or about February 2008, Inselberg obtained Eli Manning's one and only game-worn Super Bowl XLII helmet from Ed Skiba. Inselberg still has the helmet as part of his personal collection.

126.    In or about the summer of 2008, Joe Skiba took a different helmet and made it appear as if it had been worn by Manning during Super Bowl XLII. Skiba did so at the request of

Pat Hanlon, the Giants' Vice-President of Communications, who is responsible for promoting the Giants' brand and putting a positive spin on Giants-related news, including trying to prevent unflattering news of the Giants from spinning out of control. Hanlon asked Joe Skiba for Manning's Super Bowl XLII helmet because the Giants intended to display it alongside David Tyree's Super Bowl XLII helmet to commemorate the miraculous play that enabled the Giants to win the game and defeat the previously unbeaten New England Patriots. When Joe Skiba told Hanlon that the helmet was no longer available, Hanlon asked Skiba to create a replica "show helmet."

127.    Inselberg learned about the forgery on or about June 17, 2008 when a press release claimed that Manning's Super Bowl XLI helmet – the helmet Inselberg had in his possession – would be on display at the Sports Museum of America in New York City.

128.    In or about the fall of 2008, the fake Manning helmet and the real Tyree helmet were moved to the Pro Football Hall of Fame in Canton, Ohio, where they have remained on display to this day. The Giants' fraudulent creation of the Manning "show helmet" has caused countless visitors to the Hall of Fame to be duped. Moreover, it has caused the Hall of Fame's website to contain the following false statement:

> One of the most memorable moments in Super Bowl history is preserved at the Pro Football Hall of Fame. The helmets worn by New York Giants' teammates Eli Manning and David Tyree in their team's Super Bowl XLII win over the New England Patriots arrived at the Hall of Fame in March 2009.

129.    In or about the spring of 2008, Eli Manning instructed Joe Skiba to take unused jerseys and helmets and make the items appear to have been worn during games. Skiba followed Manning's instructions and provided the requested items to Manning, who in turn gave them to Steiner for resale. Upon information and belief, Manning misrepresented the nature of the items

35

to Steiner by claiming that he had worn them during Giants games. Those items in turn were sold by Steiner to unwitting customers and sent to them via the mails.

130. An email exchange between Inselberg and Joe Skiba on August 30 and 31, 2008, reflects Joe Skiba's admission that Manning instructed him to create false game worn memorabilia. On August 30, 2008 at 8:27 PM, Inselberg wrote:

> Hey Joe, my buddy was offered an eli game used helmet and jersey. Are these the bs ones eli asked you to make up because he didnt want to give up the real stuff?

On August 31, 2008 at 7:29 AM, Joe Skiba replied:

> BS ones, you are correct…

*See* Exhibit B (copy of the email exchange).

131. Upon information and belief, Steiner Sports has received numerous complaints from customers who purchased Manning's supposedly game-worn helmets. The angry customers told Steiner that the purchased helmets' markings failed to match the markings that appeared in pictures of Manning's helmets that were taken during games. Nevertheless, because Manning represented to Steiner that these were his game-worn helmets, Steiner has proceeded to market and sell the helmets to memorabilia collectors. Based on Manning's representations, even helmets returned by angry customers were resold by Steiner Sports as supposedly game-worn Eli Manning helmets.

132. Prior to the Skibas' false testimony before the Grand Jury, Defendant Heller was aware of Manning's involvement in game-worn memorabilia fraud, as he was directly placed on notice of it by Inselberg and Inselberg's attorney on several occasions. For example, in a letter dated September 28, 2011, Inselberg's attorney wrote to Heller:

> Upon review of the Steiner advertisements on EBay in which it is attempting to auction off a "game used" worn Manning helmet, we both

36

> understand it is questionable. Apparently Eli Manning is not the only quarterback or other named player that may be submitting questionable memorabilia to Steiner to sell to the general public. It is my understanding that Eric submitted this information to you as a result of your comments as to the fact that the Giants are attempting to resolve this problem so it does not have an adverse effect on the New York Giants. I trust that you are communicating with Steiner to ensure that the questionable memorabilia is taken off the market.

Within a few weeks of receiving this letter, Heller contacted Inselberg directly and advised him that he should get a different attorney.

133.    In or about 2012, after the Giants won their second Super Bowl with Manning at starting quarterback, Manning gave two helmets to Steiner Sports: one he claimed was the helmet he actually wore during Super Bowl XLVI, while the other he said he wore during the season and served as his backup helmet during the Super Bowl. Inselberg purchased the supposed backup helmet from Steiner for approximately $11,500.00, and a separate unknown collector purchased the supposedly game-worn helmet for approximately $46,000.00.

134.    Based on a comparison between photographs of Eli Manning's helmet during Super Bowl XLVI and photographs of the helmets sold by Steiner Sports, it is evident that neither helmet is consistent with the build of the helmet that Manning actually wore during the Super Bowl. Upon information and belief, both fake helmets were created by Joe Skiba, once again at the direction of Manning so that he could appear to fulfill his contractual obligation to Steiner Sports.

135.    Had the FBI or the media learned about the foregoing incidents of game-worn memorabilia fraud, among others, the consequences for the organization and the team would have been devastating. Upon information and belief, the Giants were willing to obstruct justice and suborn perjury to prevent that from happening.

37

## THE WRONGFUL INDICTMENT

### Inselberg Is Indicted By the Grand Jury Immediately After the Skibas Testify

136. On October 25, 2011—the same date that Joe and Ed Skiba testified, and over a year after it began investigating Inselberg—the Grand Jury seated in the Northern District of Illinois returned a criminal Indictment against Eric Inselberg, charging him with two counts of mail fraud. Specifically, the Indictment alleged that Inselberg misrepresented unused jerseys as game-worn or game-used in order to fraudulently obtain higher prices for the merchandise.

137. On the same date that Inselberg was indicted, five other sports memorabilia resellers were also charged with fraudulently doctoring jerseys to make them appear game-used and reselling them.

138. The Indictment's allegations against Inselberg were meritless. Inselberg always represented the nature of the items he offered for sale accurately and in full accordance with his knowledge and belief. He never intentionally misrepresented any items of memorabilia he sold.

139. The Giants' witnesses' obstructive statements and perjured testimony, however, misled the Grand Jury into believing that the Indictment's allegations were supported by probable cause. Thus the Grand Jury's Indictment of Inselberg was directly and proximately caused by the wrongful acts of the Defendants detailed above.

140. On September 4, 2012, the Grand Jury returned a superseding Indictment charging Inselberg with four counts of mail fraud. If he had been convicted, Inselberg faced a maximum of 80 years in a federal penitentiary. The basis for the claims was substantially the same as the original Indictment, and its allegations of criminal conduct were equally baseless.

141. Despite being well aware of the fact that Inselberg was represented by counsel, Heller attempted to speak directly with Inselberg on multiple occasions while he was under Indictment. The first such contact was initiated on or about September 11, 2012—days after the

38

last of the five other indicted memorabilia resellers pleaded guilty, leaving Inselberg as the last man standing—when Heller called Inselberg's cell phone from the Giants' offices. Upon information and belief, this call was made for the primary purpose of attempting to learn whether any Giants' employees might be publicly implicated in connection with Inselberg's case.

## The U.S. Attorney Dismisses the Indictment after Inselberg's Attorneys Prove the Giants' Witnesses Committed Perjury and Obstructed Justice

142. On October 9, 2012, Inselberg's attorneys moved to dismiss the superseding Indictment. The motion to dismiss was based upon the Indictment being wrongfully procured in reliance upon the lies and perjury chronicled in this Complaint. In support of the motion, Inselberg's attorneys provided the prosecution with a massive amount of discovery, including thousands of color photos, which conclusively refuted the portions of the Giants' witnesses' Grand Jury testimony quoted above.

143. On February 15, 2013, the Government filed a brief in opposition to Inselberg's motion to dismiss. The brief primarily argued that Inselberg was not entitled to dismissal because he could not show prosecutorial misconduct, i.e. that the Government knew that Grand Jury witnesses were lying. The Government did not take a position on whether perjury had occurred, however, stating in a footnote: "At this time, the government is not persuaded that perjury occurred before the Grand Jury. Nevertheless, the government takes the defendant's allegations seriously and continues to analyze them."

144. On April 16, 2013, Inselberg's attorneys filed a Reply Brief noting that the Government's response to Inselberg's pretrial motions did not in any way dispute that Inselberg's Indictment was wrongfully procured in reliance upon the Giants' witnesses lies and perjury.

145. On April 18, 2013, just two days after Inselberg filed a reply brief noting the Government's failure to make any argument that the Giants' witnesses told the truth, the Government filed a two-sentence motion to dismiss the case and all charges against Inselberg.

146. Before ruling on the unexplained motion, the Court wanted to understand what was going on. On May 2, 2013, the Assistant U.S. Attorney for the Northern District of Illinois in charge of the case walked into the federal courthouse in Rockford, Illinois, and requested the dismissal of the Indictment against Inselberg. The Court inquired whether the dismissal was because Inselberg was going to be prosecuted someplace else. The prosecutor responded, "No, Your Honor. It's a dismissal, complete dismissal. I can tell the court that the U.S. Attorney's Office reevaluated the strength of the case in light of some new facts that were pointed out to us by defense counsel, and we determined that the prosecution was no longer appropriate." *See* Exhibit C, at 2 (transcript of May 2, 2013 proceedings).

147. While Inselberg is no longer facing the specter of going to prison as an innocent man, the irreparable damage to his livelihood and his reputation continues to this day, as does the severe psychological trauma of having had his life turned upside-down.

## ACTUAL DAMAGES

148. The public Indictment of Inselberg caused immediate, severe damage to Inselberg's reputation, both personally and professionally. It has caused Inselberg to lose numerous preexisting personal and business relationships, and it has frequently prevented Inselberg from forming new relationships.

149. Prior to the wrongful Indictment, Inselberg had a thriving business focused on the collection and sale of sports memorabilia, which had an average yearly gross of approximately $500,000. The wrongful Indictment brought on by the Defendants' misconduct destroyed the

most important asset of that business: Inselberg's credibility. Aside from a handful of collectors who were close friends with Inselberg, nobody would deal with Inselberg based upon the perception emanating from the Indictment that he was a fraud. Thus as result of the Giants' misconduct, Inselberg's profitable sports memorabilia business, a labor of love, was annihilated.

150. To help finance his defense, Inselberg was required to engage in, among other things, a fire-sale of memorabilia that had taken him years to acquire. The memorabilia had a significantly higher market value than what Inselberg was able to realize under such a tight timeframe and in light of his severely tarnished reputation.

151. The financial and psychological pressures of combating the wrongful Indictment caused a ripple effect throughout all of Inselberg's entrepreneurial endeavors. In addition to having his reputation severely tarnished, Inselberg was unable to focus on work and was in a constant state of agitation, causing him to be ineffective as a business partner. Inselberg was unable to devote financial resources into his business ventures because he needed to fund his legal defense and hopefully preserve his freedom. The result was a complete loss of Inselberg's businesses.

152. Inselberg's burgeoning business based on his Wireless Patents slowly but surely disintegrated because of the fall-out from the Indictment. Potential counterparties refused to do business with him and his partners, and his own IP lawyers eventually terminated the representation as a direct result of Inselberg's Indictment. The death knell came when Inselberg Interactive was forced to default on the Bisignano Loan and relinquish ownership of the patents, as described above. If Inselberg had not been indicted, none of these losses would have occurred.

153. In addition to lost ownership and royalties from the Wireless Patents, Inselberg has suffered further damages as the Giants have misappropriated Inselberg's patent concepts and

41

integrated them into their wireless platforms without compensating Inselberg.

154. Subject to expert valuation, Inselberg's losses with regard to the patents are at least $10 million—the amount of an offer made (and rejected) prior to Inselberg's Indictment—and are likely significantly more. The Defendants are liable for the entire amount of these losses, since Inselberg's inability to exploit the patents' fair value and his default on the Bisignano Loan were the direct and proximate results of the Defendants' misconduct.

155. Inselberg's substantial investment of time and money (approximately $200,000) in developing and testing the Helmet Patents has been irretrievably lost as a direct result of Heller's instructions to Joe Skiba to stop doing business with Inselberg. Further, Inselberg loaned the Skibas approximately $80,000, but neither the principal nor the interest have been paid, and likely will never be paid, as a direct result of the Giants' interference with the development of the Helmet Patents.

156. Inselberg has further economic damages in the form of a reasonable *quantum meruit* commission for his services facilitating an extremely lucrative deal between the Giants and JPMorgan Chase. Despite receiving the benefit of Inselberg's services in putting the parties together, the Giants never compensated Inselberg, as promised by the Giants and as is customary in such transactions.

157. Inselberg has also been damaged as a direct and proximate result of Eli Manning's sales of fraudulent memorabilia. Inselberg acquired an item that Manning represented as his backup helmet from Super Bowl XLVI, but which Inselberg has since learned to be a fake. Additionally, Inselberg acquired several real pieces of Manning memorabilia from the Skibas over the years, including a 2004 rookie helmet and the helmet Manning wore during Super Bowl XLII. Even though Inselberg legitimately acquired the real helmets, the Giants nevertheless

42

created or caused the creation of fake helmets, which have been distributed with the Giants' assertions of authenticity to back them up. Such fake items have caused and continued to cause damage to Inselberg by diminishing the value of Inselberg's authentic Manning memorabilia, especially the real Manning Super Bowl XLII helmet, and by undermining his credibility as an honest collector with regard to these items.

158. The financial and psychological damage caused by the Defendants began even before the Indictment was issued, when the Giants' witnesses lied to the FBI. Those lies gave the Government's investigation of Inselberg false traction, and thus kept it going long past the point when it should have been terminated. Furthermore, the mental distress caused by the unwarranted continuation of the FBI's investigation became significantly worse when he learned about the false statements that were being given to the FBI at the direction of Heller and others.

159. Although the Indictment was ultimately dismissed, it was not before Inselberg incurred over $700,000 in legal defense fees and costs. Moreover, Inselberg's reputation has only modestly improved since the Indictment's dismissal. For instance, media reports covering the dismissal continued to suggest that Inselberg was a fraudster. Inselberg's once-stellar reputation as a memorabilia collector and businessman has been irretrievably taken away from him.

160. The trauma from the nightmarish experience of being wrongfully and maliciously prosecuted has so adversely affected Inselberg's health, economic livelihood, personal life, and mental/emotional well-being, that Inselberg can no longer function as the person that he was prior to this ordeal. Inselberg has lost virtually everything that he has worked for, and has watched his aspirations dissolve—even the dismissal of the Indictment has failed to resurrect them.

161. As a direct and proximate result of the Giants' misconduct, Inselberg has suffered an extreme level of emotional distress. Prior to 2011, Inselberg had never sought the services of

a mental health professional. Since the wrongful Indictment, however, Inselberg has received ongoing treatment and counseling in an effort to cope with the destruction of his life. He has been diagnosed with post-traumatic stress disorder, panic disorder with agoraphobia, and major depressive disorder. His depression is so acute, that he has had periodic suicidal thoughts that have gone beyond mere ideation. He has gone so far as to plan his own demise, including once even after the Indictment was dismissed.

162. Inselberg has suffered and continues to suffer undeserved indignities in his daily life as a result of the wrongful Indictment. For example, despite the fact that he had an ongoing banking relationship with Chase Bank at its highest levels, the Indictment resulted in Chase abruptly closing Inselberg's accounts and canceling his credit cards.

163. Inselberg had begun volunteering as a mentor with inner-city schoolchildren in or about 2009, but he stopped participating while facing the pressures of the Government's investigation and prosecution. After dismissal of the Indictment, Inselberg attempted to return to volunteering along with his friend and business partner Bill Ard. This volunteerism proved very rewarding for Inselberg while providing a positive outlet and relatively effective coping mechanism for the post-traumatic stress he continued to face. But even that outlet has been incapacitated by the lingering stigma of the wrongful Indictment. In or about October 2013, the teacher gave the kids an assignment to do a Google search on their volunteer mentors, including Inselberg. Not wanting the kids to see news of the Indictment, and not wanting to have to explain to the kids that he is not a criminal, Inselberg substantially diminished his participation in the program instead. The charitable program that was once an opportunity to feel relief and a much-needed sense of purpose became a source of fear and embarrassment—debilitating feelings which have plagued him every single day for more than two years.

## COUNT ONE

### (New Jersey Civil RICO - *N.J.S.A.* 2C:41-1 *et seq.*)

164. Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

165. This Count is against Defendants New York Football Giants, Heller, Manning, Wagner, Joe Skiba, Ed Skiba, Barone, Park Cleaners, and John Does A-Z (collectively, the "RICO Defendants").

166. The RICO Defendants violated the New Jersey Civil RICO statute by committing or conspiring amongst themselves and others to commit a pattern of racketeering activity in violation of N.J.S.A. 2C:41-2(c) and -2(d).

### The Enterprise

167. The New York Giants football program is an association in-fact comprised of numerous principal corporations, including Defendant New York Football Giants, Inc., corporate vendors, such as Defendant Park Cleaners, and individuals, including Defendants Mara, Heller, Manning, Wagner, Joe Skiba, Ed Skiba, Procops, and Barone (the "Giants Enterprise"). Numerous unnamed non-parties are likewise members of the Giants Enterprise.

168. The Giants Enterprise is engaged in numerous activities which affect trade or commerce, all of which relate to the operation of a professional football team, the New York Giants. These activities include, *inter alia*, the hosting of football games at the MetLife Stadium in New Jersey, as well as the creation, purchase, modification, and disposal of uniforms and equipment.

169. The members of the Giants Enterprise played specific and well-defined roles in the process of enabling the Giants football team to compete in the NFL.

170. The members of the Giants Enterprise shared the common purpose of obtaining pecuniary gain, including money, in connection with the operation of the Giants football team, and therefore had a shared interest in promoting the brand and public image of the Giants football team, including individual players, as well as in protecting the Giants football team's and players' reputations against potential harm.

171. Part of the Giants Enterprise entails the trade, distribution, and display of the Giants' game-used sports memorabilia, which is an important part of promoting the team's brand (i.e. its image) with its fans and with the general public. The Giants' equipment staff (Wagner and the Skibas) engaged in this practice both directly, for personal profit as a side-benefit of their positions within the Giants Enterprise, and indirectly, by helping players sell and distribute their own game-used items. Many of the team's players (including Manning) sell items of memorabilia through outside companies, such as Steiner Sports, for personal profit as a side-benefit of being members of the team. From time to time, members of the Giants' front office (including Heller and Vice-President of Communications Pat Hanlon) also participated in the distribution and display of game-used Giants memorabilia in order to promote the Giants' brand and public image.

172. The Giants Enterprise is an enterprise within the meaning of *N.J.S.A.* 2C:41-1(c).

**Defendants' Violations of the New Jersey RICO Statute**

173. The RICO Defendants did conduct or participate, directly or indirectly, in the conduct of the Giants Enterprise's affairs through the pattern of racketeering activity detailed herein, in violation of *N.J.S.A.* 2C:41-2(c).

174. The RICO Defendants did conspire and agree with one another to conduct or participate, directly or indirectly, in the conduct of certain of the Giants Enterprises affairs through a pattern of racketeering activity in violation of *N.J.S.A.* 2C:41-2(d). In furtherance of that

46

conspiracy, Defendants committed overt acts that include but are not limited to the incidents of racketeering activity alleged herein.

175. The acts commenced by Defendants while participating in the affairs of the Giants Enterprise, were done by them individually, collectively, and on behalf of their principals and/or through their agents, either while present in, or by the instrumentalities of intrastate and/or interstate commerce to and from and within the State of New Jersey, and elsewhere.

## The Pattern of Racketeering Activity

176. The RICO Defendants are responsible for committing two or more separate and distinct criminal acts, which fall within the definition of racketeering activity, and which collectively constitute a pattern of racketeering activity, lasting from at least 2001 through 2013.

177. The RICO Defendants' incidents of racketeering activity included the fraudulent practices of creating, distributing, and selling fraudulent memorabilia, as well as making or causing others to make false statements in an effort to cover up those acts, as alleged in detail above. *N.J.S.A.* 2C:41-1(a)(1)(o). Defendants so acted with knowledge and intent, and/or were willfully blind to or deliberately ignorant of the fraudulent nature of the memorabilia they were distributing.

178. Defendants Manning, Wagner and others perpetrated theft by deception in violation of *N.J.S.A.* 2C:20-4, by creating and/or reinforcing materially false impressions about the prior use of helmets, jerseys, and other items of memorabilia that they were seeking to sell, and then failing to correct those materially false impressions, as alleged in detail above.

179. Defendants also engaged in racketeering activity under 18 U.S.C. § 1961(1)(B) as applicable through *N.J.S.A.* 2C:41-1(2), by committing acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), obstruction of justice (18 U.S.C. § 1503), and witness tampering (18 U.S.C. § 1512).

47

180. As alleged in detail above, the RICO Defendants, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, willfully and knowingly devised schemes or artifices: to defraud Plaintiff and others; to obtain money or property by means of false pretenses and representations; and to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use counterfeit or spurious articles. For the purpose of executing their schemes or artifices, the RICO Defendants did send and receive matters or things, or caused matters or things to be sent or received, through the mails (including private or commercial interstate carriers), and they did transmit, or caused to be transmitted, writings, signs, signals, pictures, and/or sounds by means of wire, radio, television and internet communications in interstate commerce.

181. The RICO Defendants did knowingly and corruptly influence, obstruct, and impede, and endeavor to influence, obstruct and impede, the due administration of justice, namely the Government investigation of sports memorabilia fraud and related Grand Jury proceedings in the Northern District of Illinois, by misleading and deceiving FBI agents and the Grand Jury, as alleged in detail above, in violation of 18 U.S.C. § 1503.

182. As alleged in detail above, Defendants Heller, Wagner, and the New York Football Giants did knowingly intimidate, threaten, and corruptly persuade witnesses (Joe Skiba, Ed Skiba, and Barry Barone), or attempted to do so, and did engage in misleading conduct toward those witnesses and others, with the intent to: (a) influence the witnesses' testimony before an official proceeding, and (b) hinder, delay, or prevent the communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a federal offense, in violation 18 U.S.C. § 1512(b). The RICO Defendants also violated 18 U.S.C. § 1512(c) by corruptly obstructing, influencing, and impeding an official proceeding.

183.   The foregoing incidents of racketeering activity had, among other things, the same or similar intents, results, victims, and methods of commission.  The acts of memorabilia fraud set forth above were done for purposes of direct or indirect monetary gain through deception of memorabilia collectors and the Giants' fans.  The foregoing acts of obstruction, witness tampering, and false statements

184.   To the extent that certain of the RICO Defendants did not directly perpetrate certain incidents of racketeering as principals, those Defendants aided and abetted the incidents of racketeering with the specific intent to help the crimes succeed.

185.   Defendants New York Giants, Inc. and Park Cleaners, Inc. are also liable for the racketeering of their respective principals, agents, and employees under the doctrine of *respondeat superior* in that many of the racketeering incidents were carried out for the benefit of these corporations, and these corporations did in fact benefit from their principals', agents', and employees' racketeering activities.

**Standing and Proximate Cause**

186.   The RICO Defendants' pattern of racketeering activity directly damaged Plaintiff in that Defendants' conduct was the cause-in-fact of Plaintiff' actual damages described above, as well as the legal and proximate cause.

187.   Inselberg has standing to bring this claim based on the above-detailed allegations of damages caused by the pattern of racketeering activity.  In addition to the damages described above, the RICO Defendants' schemes to defraud and incidents of fraudulent practices relating to the New York Giants' game-worn memorabilia damaged Inselberg in his business and property because he was engaged in the buying and selling of sports memorabilia, especially the New York Giants' game-worn memorabilia.  Defendants' practice of conjuring fake memorabilia gave them

49

an unfair competitive advantage over Inselberg, who was limited to dealing in real items. Defendants' flooding the market with false memorabilia also substantially stripped away the value of the real memorabilia that Inselberg had acquired, particularly when it came to Manning's memorabilia because, unlike the items Inselberg acquired, the fake items being sold were accompanied by Eli Manning's assertions of authenticity.

188. By reason of the foregoing, the RICO Defendants and each of them, singly and in concert, directly and indirectly, are liable for engaging in prohibited activities under New Jersey's RICO statute, *N.J.S.A.* 2C:41-2(a), (b), (c), and (d). These violations have damaged Plaintiff as described above, and he is entitled to the legal and equitable relief requested below, including recovery of three times the actual damages he has sustained pursuant to *N.J.S.A.* 2C:41-4(c).

## COUNT TWO

### (Tortious Interference with Prospective Economic Advantage)

189. Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

190. This Count Two is against all Defendants, who have individually and collectively engaged in tortious interference with prospective economic advantage.

191. Plaintiff had the right to pursue his calling, occupation, and business endeavors and relationships, described in detail above, free from undue influence and molestation, which created a protectable interest of prospective economic advantage on the part of Plaintiff.

192. By engaging in the course of conduct described herein, Defendants maliciously interfered with Plaintiff's reasonable expectations of economic advantage, because Defendants acted intentionally and without justification or excuse.

193. But for Defendants' tortious interference with Plaintiff's calling, occupation, and business endeavors and relationships, it was a reasonable probability that Plaintiff would have received the anticipated economic benefits thereof.

## COUNT THREE

### (Tortious Interference with Contractual Relations)

194. Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

195. This Count Three is against all Defendants, who have individually and collectively engaged in tortious interference with contractual relations.

196. Inselberg previously entered into a series of contracts in connection with his patents and his sports memorabilia business.

197. By engaging in the course of conduct described herein, Defendants maliciously interfered with Plaintiff's contractual relations, because Defendants acted intentionally and without justification or excuse.

198. Defendants' tortious interference with Inselberg's contractual relations has caused loss of prospective gain, and has resulted in damages to Plaintiff.

## COUNT FOUR

### (Malicious Prosecution)

199. Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

200. This Count Four is against Defendants New York Football Giants, Heller, Wagner, Joe Skiba, Ed Skiba, Park Cleaners, Barone, and John Does A-Z, who are individually and collectively responsible for the malicious prosecution of Eric Inselberg.

51

201. By engaging in the course of conduct described above, Defendants instituted criminal action against Inselberg by causing Inselberg to be indicted by the Grand Jury as a direct and proximate result of their conduct and testimony.

202. Defendants' conduct was actuated by malice, insofar as the Defendants sought to implicate Inselberg in wrongdoing in order to avoid prosecution for their own misconduct.

203. There was an absence of probable cause to support Inselberg's Indictment.

204. The criminal prosecution against Inselberg was terminated in Inselberg's favor.

205. As a direct, proximate and foreseeable result of the Defendants' conduct, Inselberg has suffered significant damages, including a special grievance consisting of an interference with his liberty and property beyond the ordinary expenses of his criminal defense.

## COUNT FIVE

### (Abuse of Process)

206. Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

207. This Count Five is against Defendants New York Football Giants, Heller, Wagner, Joe Skiba, Ed Skiba, Park Cleaners, Barone, and John Does A-Z, who have individually and collectively engaged in abuse of process.

208. By engaging in the course of conduct described above, Defendants made an improper, unwarranted, and perverted use of the grand jury and criminal prosecutorial process after it had been issued.

209. As described above, Defendants had ulterior motives in securing the legal process against Inselberg.

210. By using the grand jury process to secure an indictment against Inselberg, Defendants acted under color of state law, in that they acted together with or obtained significant aid from state officials.

211. As a direct, proximate and foreseeable result of the Defendants' abuse of process, Inselberg has suffered and will continue to suffer harm.

## COUNT SIX

### (Trade Libel)

212. Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

213. This Count Six is against Defendants New York Football Giants, Mara, Procops, Heller, Wagner, Joe Skiba, Ed Skiba, Park Cleaners, Barone, and John Does A-Z, who have individually and collectively engaged in trade libel.

214. By engaging in the course of conduct described above, specifically through the false statements made to the FBI, the Grand Jury perjury, Procops' malicious assault on Inselberg's reputation, and the instigation, aiding and abetting of the same, Defendants published material derogatory as to the quality of Plaintiff's business, of a kind calculated to prevent others from dealing with Plaintiff, and likewise calculated to interfere adversely with Plaintiff's relations with others.

215. Defendants knowingly and/or recklessly communicated falsehoods to third persons, and those falsehoods played a material and substantial part in leading others not to deal with Plaintiff.

216. As a direct, proximate, and foreseeable result of the Defendants' conduct, Plaintiff has suffered per se reputational damages, as well as special damages through the loss present

53

and prospective advantage in the form of pecuniary loss.

## COUNT SEVEN

### (Intentional Infliction of Emotional Distress)

217.   Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

218.   This Count is against Defendants New York Football Giants, Heller, Wagner, Joe Skiba, Ed Skiba, Park Cleaners, Barone, and John Does A-Z, who have acted intentionally and/or recklessly to inflict emotion distress upon Plaintiff.

219.   Defendants' conduct, as set forth above, is so extreme and outrageous as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

220.   As a direct, proximate, and foreseeable result of the Defendants' conduct, Plaintiff has suffered and continues to suffer damages in the form of emotional distress so severe that no reasonable man could be expected to endure it.

## COUNT EIGHT

### (Quasi-Contract - Unjust Enrichment)

221.   Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

222.   This Count Eight is against Defendant New York Football Giants for its breach of quasi-contract and unjust enrichment.

223.   The Giants misappropriation of Inselberg's wireless patent and marketing concepts and integration of them into the Giants' wireless platforms and the Giants entry into the lucrative banking deal with JP Morgan Chase, as set forth in detail above, conferred financial benefit upon

54

Defendants.

224.    Defendant has failed to compensate Inselberg for the benefits it has received, resulting in Defendants' unjust enrichment at Inselberg's expense.

225.    Defendant's unjust enrichment has caused Inselberg to be harmed and suffer damages.

## COUNT NINE

### (Quasi-Contract - *Quantum Meruit*)

226.    Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

227.    This Count Nine is against Defendant New York Football Giants for its breach of quasi-contract by failing to compensate Inselberg *in quantum meruit*.

228.    By putting together the lucrative banking deal with JP Morgan Chase, Inselberg performed services for the Giants in good faith, and Giants accepted, used and enjoyed those services.

229.    Inselberg reasonably expected compensation for said services, which had substantial value, and Defendant by and through its agents knew that Inselberg expected compensation.

230.    Inselberg has been harmed and suffered damages, entitling Inselberg to the reasonable value of said services.

## COUNT TEN

### (Unfair Competition - Misappropriation)

231.    Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

232. This Count Ten is against Defendants New York Football Giants and John Does A-Z.

233. The Giants have engaged in unfair competition and misappropriation in violation of New Jersey common law by knowingly, willfully, maliciously, recklessly, and/or negligently:

    a. Engaging in "reverse palming off" emanating from the Giants' absolute failure to appropriately credit Inselberg for the use of Inselberg's patented wireless marketing concepts and integration of them into the Giants' wireless platforms;

    b. Further engaging in "reverse palming off" emanating from the Giants' deceitful omission from the public that Inselberg's patented wireless marketing concepts used and integrated into the Giants' wireless platforms were the work of Plaintiff;

    c. Falsely designating the origin of Inselberg's patented wireless marketing concepts used and integrated into the Giants' wireless platforms in such a manner that the Giants have created a deception as well as confusion concerning the origin of said wireless patent concepts; and

    d. Violating Inselberg's generally recognizable right not to have his ideas, skills, efforts, contributions, time, and labor, misappropriated by another.

234. Inselberg's patented wireless marketing concepts used and integrated into the Giants' wireless platforms are novel and worthy of protection on grounds that said concepts are both innovative and original.

235. Inselberg's patented wireless marketing concepts used and integrated into the Giants' wireless platforms were presented in confidence to the Giants, who understood them to be for sale, and were adopted and made use of by the Giants in connection with their own activities without compensation to Inselberg, either directly or indirectly.

56

236.    As a result of Defendant's unfair competition and misappropriation, Plaintiff has been damaged thereby.

## COUNT ELEVEN

### (Breach of Contract)

237.    Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

238.    The Count Eleven is against Defendants Joe Skiba and Ed Skiba.

239.    On September 21, 2003, Inselberg and the Skibas entered into a Line of Credit Agreement with a corresponding "Promissory Note with Collection of Costs and Waiver of Presentment," whereby Inselberg agreed to loan the Skibas up to $100,000 with a 4% annual rate of interest, payable on December 31, 2012, or upon sale of the patents, whichever came first.

240.    Based on this agreement, Inselberg loaned approximately $80,000 to Joe and Ed Skiba over the course of several years.

241.    The Skibas have since defaulted on the Agreement and the corresponding Promissory Note by failing to repay Inselberg any of the amounts due.

242.    Plaintiff has at all times performed in accordance with the terms of said Line of Credit Agreement, to be performed by him and has done so in the manner specified by the Line of Credit Agreement.

243.    By failing to repay said loan, Defendants Joe and Ed Skiba have failed and refused, and continue to fail and refuse to perform the Line of Credit Agreement on their part. Defendants Joe and Ed Skiba's breach of the Line of Credit Agreement is material and goes to the essence of the Line of Credit Agreement, and likewise violates the implied covenant of good faith and fair

57

dealing, as Defendants have made no effort to repay said loan, and have ceased all contact with Plaintiff.

244.    Defendants Joe and Ed Skiba's breach has caused Plaintiff to be harmed and suffer damages.

245.    By reason of the foregoing, Defendants Joe and Ed Skiba have engaged in breach of contract and are liable to Plaintiff for the damages, including the full amount loaned plus accrued interest.

## COUNT TWELVE

## (Civil Conspiracy)

246.    Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

247.    Two or more of the Defendants formed an unlawful agreement, or multiple unlawful agreements, among themselves (and, as to the corporate defendants, of their principals, agents, officers, management, control persons and/or other employees), to engage in the tortious conduct described above.

248.    Even if they did not explicitly agree to commit the tortious acts, Defendants understood the general objectives and contours of the scheme, accepted their parts to further them, and acted accordingly.

249.    During the course of the conspiratorial agreement(s) and in furtherance of each conspiratorial objective, at least one overt act was committed by Defendants.

250.    The above-pleaded wrongful conduct is the product of the unlawful agreement(s) among Defendants.

58

251.     Defendants' civil conspiracy has thus caused Plaintiff to be harmed and suffer damages.

252.     By reason of the foregoing, Defendants have engaged in civil conspiracy and are jointly liable to Plaintiff.

## COUNT THIRTEEN

### (Aiding & Abetting)

253.     Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

254.     Defendants have committed independently wrongful acts, as set forth above.

255.     Defendants committed the tortious acts in concert with one another, or pursuant to a common design or scheme.

256.     Defendants knew of the wrongful acts and substantially assisted or encouraged other Defendants to effectuate the wrongful acts against Plaintiff.

257.     Defendants' aiding and abetting has caused Plaintiff to be harmed and suffer damages.

258.     By reason of the foregoing, Defendants have engaged in aiding and abetting and are jointly liable to Plaintiff.

## COUNT FOURTEEN

### (Negligent Supervision)

259.     Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

260.     This Count Fourteen is against Defendants New York Football Giants, Mara, and Heller for their negligent supervision of Giants employees.

59

261. As the Giants' President and CEO, John Mara is responsible for all administrative, legal, and financial aspects of the organization.

262. As the Giants' Senior Vice-President and General Counsel, William Heller is responsible for all of the Giants' legal affairs.

263. In their respective capacities, Heller had a duty to supervise all Giants employees in connection with all legal matters, and Mara had a duty to supervise all Giants employees, including Heller, in all matters.

264. The Giants, conducting their activities through their employees and agents, are subject to liability for the harm to Inselberg resulting from their employees and agents' conduct, for being negligent and/or reckless in the supervision of their employees and agents' activities.

265. Defendants Giants, Mara and Heller knew or had reason to know of the particular unfitness, incompetence, and untrustworthiness of the Giants employees who were involved in the wrongful, criminal and tortious conduct described above.

266. Defendants Giants, Mara and Heller could reasonably have foreseen that such qualities created a risk of harm to other persons, including Plaintiff.

267. Defendants Giants, Mara and Heller negligently failed to control the Giants' employees to prevent the reasonably foreseeable risks of harm to other persons.

268. Defendants Giants, Mara, and Heller are likewise liable for negligently performing their duty to train and supervise their agents and employees. By engaging in the course of conduct described above, and by failing to have any policies or procedures in place governing the relevant misconduct—specifically, the false statements, deceit, perjury, witness tampering, obstruction of justice, and fraud in connection with the sale of memorabilia—Defendants breached their duty to supervise.

60

269.    As direct, proximate, and foreseeable result of Defendants' negligence in supervising the Giants' employees, Plaintiff has suffered and continues to suffer damages.

## COUNT FIFTEEN

### (Negligent Retention)

270.    Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

271.    This Count Fifteen is against Defendants New York Football Giants, Mara, and Heller for their negligent retention of Giants employees who committed the wrongful, criminal, and tortious acts described above.

272.    Defendants New York Football Giants, Mara, and Heller were aware or should have been aware of employees' conduct, which indicated that the employees were unfit for employment, but Defendants negligently failed to take appropriate action to terminate the employees.

273.    As direct, proximate, and foreseeable result of Defendants' negligent retention of employees whom Defendants knew or should have known had committed wrongful conduct and were likely to continue to do so, Plaintiff has suffered and continues to suffer damages.

## COUNT SIXTEEN

### (*Respondeat Superior*)

274.    Plaintiff repeats the allegations of the preceding paragraphs as though fully set forth herein.

275.    At all times relevant hereto, Mara, Heller, Procops, Wagner, and Manning, as well as the Skibas, acted as agents/employees on behalf of their employer, the Giants, while Barone acted as an agent/employee of Park Cleaners.

61

276. Defendants the New York Football Giants, Inc. and Park Cleaners, as the principals, are liable for the conduct of their respective agents/employees chronicled herein, as the agents/employees' actions/conduct were within the scope of their authority, in that said action/conduct: (a) was the kind that said agents were employed to perform; (b) occurred within authorized time and space limits; and (c) was actuated by a purpose to serve the principal.

277. At all times relevant hereto, Mara, Heller, Procops, Wagner, Manning, and the Skibas, were in the employ and/or under the direction and control of the Giants, and all acts of Mara, Heller, Procops, Wagner, Manning, and the Skibas alleged herein were within the scope of their authority and course of their employment and within the usual course of business of the Giants, who knew or should have known or had reasonable grounds to know that the acts alleged herein were committed by Mara, Heller, Procops, Wagner, Manning, and the Skibas.

278. The acts of Mara, Heller, Procops, Wagner, Ed Skiba, Joe Skiba, and Manning are deemed to be the acts of and chargeable to, and binding upon the Giants.

279. At all times relevant hereto, Barone was in the employ and/or under the direction and control of the Giants, and all acts of Barone alleged herein was within the scope of his authority and course of his employment and within the usual course of business of Park Cleaners, who knew or should have known or had reasonable grounds to know that the acts alleged herein were committed by Barone.

280. The acts of Barone are deemed to be the acts of and chargeable to, and binding upon Park Cleaners.

281. By reason of the foregoing, the Giants and Park Cleaners are vicariously liable under the doctrine of *respondeat superior*.

## **PRAYER FOR RELIEF**

WHEREFORE, Inselberg prays for relief as follows:

1.　　An award in favor of Inselberg against Defendants, jointly and severally, for all

damages sustained as a result of their wrongdoing, in an amount to be proven at trial, including:

> a.　　Compensatory damages;
>
> b.　　Consequential damages;
>
> c.　　Incidental damages;
>
> d.　　Prejudgment interest at the maximum legal rate;
>
> e.　　Treble damages;
>
> f.　　Punitive damages;
>
> g.　　Attorney's fees and all recoverable costs;
>
> h.　　A 2007 Super Bowl ring;
>
> i.　　Such other and further relief as the Court may deem just and proper.

2.　　Appropriate orders, pursuant to *N.J.S.A.* 2C:41-4(a), to prevent and restrain the acts

or conduct which constitute violations of the New Jersey Civil RICO Statute, *N.J.S.A.* 2C:41-2,

including as follows:

> a.　　An order of restitution for the identifiable non-party victims of Defendants' fraud, enabling such victims to the return of moneys or property unlawfully obtained from them, directly or indirectly, by Defendants;
>
> b.　　An order restraining Defendants Wagner, Joe Skiba, Ed Skiba, Barone, and Manning from participating in the sale or distribution of sports memorabilia for a substantial period of time as is reasonably necessary to prevent further incidents of fraud by these Defendants;
>
> c.　　Such other equitable relief as the Court deems necessary and just.

63

## **DESIGNATION OF TRIAL COUNSEL**

Pursuant to *R.*4:25-4, Michael S. Kasanoff, Esq. and Brian C. Brook, Esq., are hereby designated as trial counsel for Plaintiff.

## **JURY DEMAND**

Plaintiff Eric Inselberg hereby demands a trial by jury on all issues so triable.

Dated: Hackensack, New Jersey
      January 29, 2014

                                               CLINTON BROOK & PEED

                                             By:
MICHAEL S. KASANOFF                    BRIAN C. BROOK

                                        *Attorneys for Plaintiff Eric Inselberg*

64

## CERTIFICATION PURSUANT TO *R*.4:5-1

The matter in controversy is not subject to any other action pending in any Court or of a pending arbitration proceeding. No other court or arbitration proceedings are contemplated herein. Subject to what may be revealed through extensive discovery, all parties presently known by Plaintiff are named and identified in the action filed herein. I certify that the foregoing statements made by me are true. I am aware that if they are willfully false, I am subject to punishment.

Dated: Hackensack, New Jersey
      January 29, 2014

_____
MICHAEL S. KASANOFF

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE OR INDEMNIFICATION AGREEMENTS

Pursuant to *R.4:10-2(b)*, demand is made that Defendants disclose to Plaintiff's attorneys whether or not there are any insurance or indemnification agreements or policies under which any person or firm carrying insurance or indemnification agreements or policies under which any person or firm carrying on an insurance or other business may be liable to satisfy part or all of a judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgment and provide Plaintiff's attorneys with true copies of those insurance or indemnification agreements or policies, including but not limited to, any and all declaration sheets. **This demand shall include and cover not only primary coverage, but also any and all excess, catastrophe, and umbrella policies**.

Dated: Hackensack, New Jersey
      January 29, 2014

_____
MICHAEL S. KASANOFF

65

# Exhibit A

## Intellectual Property of Inselberg Interactive, LLC

| Country of Registration | Application No. | Issued PATENT NO.: | Publication No. | Title | Number of Claims In Each Patent |
|---|---|---|---|---|---|
| United States | 09/656,096 | 6,434,398 | Filed prior to 11/29/2000- Not Published | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 13 |
| Australia | 2001287073 | 2001287073 | AU8707301 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 13 |
| Canada | 2,422,168 | 2,422,168 | CA2422168 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 13 |
| United States | 09/854,267 | 6,650,903 | 2002-0029381 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 3 |
| United States | 10/661,871 | 6,975,878 | 2004-0058697 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 27 |
| United States | 11/266,783 | 7,123,930 | 2006-0068824 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 41 |
| United States | 11/542,819 | 7,522,930 | 2007-0026791 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 42 |
| United States | 11/894,163 | 7,860,523 | 2007-0287489 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 47 |
| United States | 12/927,580 | 8,131,279 | 2011-018994 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 20 |
| United States | 13/385,740 | 8,423,005 | 2012-0185324 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 22 |
| United States | 11/894,189 | 7,424,304 | 2007-0287378 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 87 |
| United States | 12/228,908 | 7,856,242 | 2009-0061917 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 94 |
| United States | 12/927,581 | 8,023,977 | 2011-0070916 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 20 |
| United States | 13/200,145 | 8,213,975 | 2012-003486 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 66 |
| United States | 13/507,131 | 8,412,172 | 2012-0252499 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 17 |
| United States | 12/381,701 | 7,693,532 | 2009-0177533 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 89 |
| United States | 10/378,582 | 6,760,595 | 2003-0144017 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 51 |
| United States | 10/792,170 | 6,996,413 | 2004-0171381 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 73 |
| Australia | 2004216690 | 2004216690 | 2004 09 16 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 73 |

## Intellectual Property of Inselberg Interactive, LLC

| Country of Registration | Application No. | Issued PATENT NO.: | Publication No. | Title | Number of Claims In Each Patent |
|---|---|---|---|---|---|
| Canada | 2518215 | 2518215 | CA2518215 | Method and Apparatus For Interactive Audience Participation at a Live Spectator Event | 73 |
| United States | 11/300,208 | 7,248,888 | 2006-0094409 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 76 |
| United States | 11/725,759 | 7,587,214 | 2007-0197247 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 120 |
| United States | 11/347,993 | 7,263,378 | 2006-0154657 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 54 |
| United States | 11/799,139 | 7,792,539 | 2007-0202900 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 104 |
| United States | 12/456,524 | 7,797,005 | 2009/0276292 | Method and Apparatus For Interactive Audience Participation a Live Entertainment Event | 302 |
| | | | | . . . . . TOTAL NUMBER OF CLAIMS - ALL PATENTS. . . . . . | 1540 |

# Exhibit B

Case 2:14-cv-01317-WJM-MF   Document 1-1   Filed 02/27/14   Page 71 of 88 PageID: 79
RE: manning steiner
Page 1 of 1

**From:** Skiba, Joe <Jskiba@giants.nfl.net>
**To:** emi44nyg
**Subject:** RE: manning steiner
**Date:** Sun, Aug 31, 2008 7:29 am

BS ones, you are correct...

**From:** emi44nyc
**Sent:** Saturday, August 30, 2008 8:27 PM
**To:** Skiba, Joe
**Subject:** manning steiner

Hey Joe, my buddy was offered an eli game used helmet and jersey. Are these the bs ones eli asked you to make up becuase he didnt want to give up the real stuff? Let me know because I will tell him correctly so no flags are raised. Also when should I get from you the lettered 08 jerseys to switch out after each week? thanks eric

Get the MapQuest Toolbar. Directions, Traffic, Gas Prices & More!

# Exhibit C

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        WESTERN DIVISION

 3   UNITED STATES OF AMERICA,    )      Docket No. 11 CR 50076
                                  )
 4                 Plaintiff,     )      Rockford, Illinois
                                  )      Thursday, May 2, 2013
 5            v.                  )      11:00 o'clock a.m.
                                  )
 6   ERIC INSELBERG,             )
                                  )
 7                 Defendant.     )

 8                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE PHILIP G. REINHARD
 9
     APPEARANCES:
10
     For the Government:       HON. GARY S. SHAPIRO
11                             Acting United States Attorney
                              (327 S. Church Street,
12                             Rockford, IL  61101) by
                               MR. MICHAEL D. LOVE
13                             Assistant U.S. Attorney

14   For the Defendant:        (No Appearance)

15   Court Reporter:           Mary T. Lindbloom
                               327 S. Church Street
16                             Rockford, Illinois  61101
                              (815) 987-4486
17

18

19

20

21

22

23

24

25
</pre>

1    THE CLERK:  11 CR 50076, U.S.A. v. Eric Inselberg.

2    MR. LOVE:  Good morning, your Honor.  Mike Love on

3    behalf of the United States.

4    THE COURT:  Good morning.  You say unopposed United

5    States combined motions for leave to dismiss the indictment.

6    What do you mean combined motions?

7    MR. LOVE:  Well, the rule seems to contemplate that

8    first I have to ask the court for permission to file a motion to

9    dismiss, and so I wanted to do it in a single step, if possible.

10   THE COURT:  All right.  That's all right.  Then I

11   understand what it is.  And Eric Inselberg is an isolated --

12   it's one case; is that right?

13   MR. LOVE:  That's correct, your Honor.

14   THE COURT:  And let me just look and see.  It's part of

15   this sports memorabilia business that you have a number of

16   indictments on, but they're all separate; is that correct?

17   MR. LOVE:  That is correct, Judge.

18   THE COURT:  And you're seeking to dismiss this because

19   it's going to be prosecuted someplace else?

20   MR. LOVE:  No, your Honor.  It's a dismissal, complete

21   dismissal.  I can tell the court that the U.S. Attorney's Office

22   reevaluated the strength of the case in light of some new facts

23   that were pointed out to us by defense counsel, and we

24   determined that the prosecution was no longer appropriate.

25   THE COURT:  All right.  I appreciate that, and that's

1   why I wanted to get you in front of me, to know what is

2   happening.  Also, there are pending motions that the defense

3   counsel had filed.

4            MR. LOVE:  That's correct, your Honor.

5            THE COURT:  And those would be dismissed along with the

6   case.

7            MR. LOVE:  Yes, your Honor.

8            THE COURT:  All right.  I understand.  And based on the

9   government's motion, the indictment against Eric Inselberg will

10  be dismissed, and all pending motions are denied as moot.

11           MR. LOVE:  Thank you, your Honor.

12           THE COURT:  Anything else?

13           MR. LOVE:  No, your Honor.

14           THE COURT:  And I take it that -- is there any bond

15  that was posted, or was this a recog bond?

16           MR. LOVE:  I believe -- my recollection is a recog

17  bond, Judge.

18           THE COURT:  All right.  Well, if that's the case --

19  you'll go back and check.  I mean, if you find that there was a

20  cash bond posted, then call Jen, and I would include that in my

21  order that the bond can be released.

22           MR. LOVE:  I understand, and I'll do that.  I will also

23  mention to the court that with regard to the other cases that

24  involved sports memorabilia that are pending for sentencing

25  before the court, one of the defendants, Schumaker, is going to

1    be continuing to cooperate in other matters through our --

2    matters in our Chicago office.

3           The other defendants I have advised their attorneys

4    that we had made the motion with regard to Mr. Inselberg and

5    that I would be working with them and with the court to schedule

6    their sentencings.

7           THE COURT:  Usually, I would have -- the probation

8    office would have gone ahead and done the PSRs.  So, if that's

9    the case, just notify Jen that you're ready and on which cases.

10          MR. LOVE:  Okay.  Will do, Judge.

11          THE COURT:  And then if you want to -- probably about

12   all of them are out-of-town attorneys?

13          MR. LOVE:  Yes, they are, with the exception of

14   Mr. Gaziano.

15          THE COURT:  All right.  Well, maybe you could give us

16   an idea of dates, you know, a couple of dates, so we can

17   schedule it.

18          MR. LOVE:  Would you prefer to do them fairly close

19   together since they're similar?

20          THE COURT:  Probably.  Probably.  I do recall the

21   pleas, and I know most of them are probably still businessmen.

22          MR. LOVE:  That's correct, your Honor.

23          THE COURT:  So, yes, it's helpful to have related --

24   even though they're not directly related, they're all the same

25   subject matter.

1           MR. LOVE:  Correct.

2           THE COURT:  Yes, that would help.  So, I guess we want

3    you to ahead of time talk with the other attorneys and say look

4    it.  We've got to start setting these for sentencing.  And if

5    you've got some suggested times in -- even as late as sometime

6    late this month, you could do that, but June or July or August

7    or September.  The earlier the better.

8           MR. LOVE:  Understood.  I will let you know, Judge,

9    that in one of them there was a typographical error and a

10   difference between a date in the information to which the

11   defendant pled guilty.  That was the wrong date off by a year or

12   a month, something like that.  It was correct in the factual

13   version in the plea agreement, but it was still our plan to

14   advise the court and, if the court agrees, to schedule to redo

15   the plea, I guess.

16          THE COURT:  Well, usually, I think you -- an

17   information you can amend on its face in front of me.

18          MR. LOVE:  Yes.

19          THE COURT:  And I don't think I have to go through the

20   entire litany.  I'll straighten it out.

21          MR. LOVE:  Understood.  Thank you, Judge.

22          THE COURT:  All right.

23          MR. LOVE:  Thank you.

24          THE COURT:  That's all.

25

1          (Which were all the proceedings had in the above-entitled

2      cause on the day and date aforesaid.)

3          I certify that the foregoing is a correct transcript from

4  the record of proceedings in the above-entitled matter.

5

6

7  Mary T. Lindbloom
   Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RECEIVED

JAN 29 2014

SUPERIOR COURT OF NEW JERSEY
COUNTY OF BERGEN
FINANCE DIVISION

**Appendix XII-B1**

|  | **CIVIL CASE INFORMATION STATEMENT**<br>**(CIS)**<br><br>Use for initial Law Division<br>Civil Part pleadings (not motions) under *Rule* 4:5-1<br>**Pleading will be rejected for filing, under *Rule* 1:5-6(c),**<br>**if information above the black bar is not completed**<br>**or attorney's signature is not affixed** | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|---|
| | | PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| | | CHG/CK NO. |
| | | AMOUNT: |
| | | OVERPAYMENT: |
| | | BATCH NUMBER: |

| ATTORNEY / PRO SE NAME<br>Michael S. Kasanoff/Brian C. Brook | TELEPHONE NUMBER<br>(908) 902-5900 | COUNTY OF VENUE<br>Bergen     ☐ |
|---|---|---|
| FIRM NAME (if applicable)<br>Brian C. Brook - Clinton Brook & Pead | | DOCKET NUMBER (when available) |
| OFFICE ADDRESS<br>157 Broad Street, Suite 321    Clinton Brook & Pead<br>P.O. Box 8175          641 Lexington Avenue - 13th Floor<br>Red Bank, NJ 07701     New York, NY 10022 | | DOCUMENT TYPE<br>Complaint |
| | | JURY DEMAND   ☒ YES    ☐ NO |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br>Eric Inselberg, Plaintiff | CAPTION<br>Eric Inselberg v. New York Football Giants, Inc., John K. Mara, William J. Heller, Christine Procops, Edward Wagner, Jr., Joseph Skiba, Edward Skiba, Eli Manning, Barry Barone, Park Cleaners, Inc. |
|---|---|

| CASE TYPE NUMBER<br>(See reverse side for listing)<br><br>508 | HURRICANE SANDY RELATED?<br>☐ YES    ☒ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?    ☐ YES    ☒ NO<br>IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
|---|---|---|
| RELATED CASES PENDING?<br>☐ YES     ☒ NO | | IF YES, LIST DOCKET NUMBERS |
| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☒ YES     ☐ NO | | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)    ☐ NONE<br>   ☒ UNKNOWN |

| **THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.** |
|---|

| CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION | |
|---|---|
| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?<br>☒ YES    ☐ NO | IF YES, IS THAT RELATIONSHIP:<br>☐ EMPLOYER/EMPLOYEE     ☐ FRIEND/NEIGHBOR     ☐ OTHER (explain)<br>☐ FAMILIAL               ☒ BUSINESS |

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?    ☒ YES    ☐ NO |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

This case involves complex litigation inclusive of RICO, and is expected to be a very high profile case. Given the nature of the case, active case management by an individually assigned judge is warranted. Preferably a judge well versed in complex litigation, and most importantly, a judge who has no conflicts preventing the judge from being impartial in a case where the New York Giants, their owner, John Mara, and their quarterback, Eli Manning, are all named Defendants, and the firm of McCarter & English is representing many of the Defendants.

| ♿   DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>     ☐ YES     ☒ NO | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED?<br>     ☐ YES     ☒ NO | IF YES, FOR WHAT LANGUAGE? |

| I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b). |
|---|
| ATTORNEY SIGNATURE: |

**SUMMONS**

Attorney(s) Michael S. Kasanoff/Brian C. Brook

Office Address 157 Broad Street, Suite 321, P.O. Box 8175

Town, State, Zip Code Red Bank, NJ 07701

Telephone Number (908) 902-5900

Attorney(s) for Plaintiff Eric Inselberg

ERIC INSELBERG

Plaintiff(s)

Vs.

NEW YORK FOOTBALL GIANTS, INC. et. al.

Defendant(s)

## Superior Court of New Jersey

BERGEN ☑ COUNTY

LAW DIVISION

Docket No: BER-L-xxxx-14

## CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/S/ Elisabeth Ann Strom
Clerk of the Superior Court

DATED: 01/28/2014

Name of Defendant to Be Served: Christine Procops

Address of Defendant to Be Served: Quest Diagnostics Training Center, 1925 Giants Drive, East Rutherford, NJ 07073

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

**SUMMONS**

Attorney(s) __Michael S. Kasanoff/Brian C. Brook__

Office Address __157 Broad Street, Suite 321, P.O. Box 8175__

Town, State, Zip Code __Red Bank, NJ 07701__

Telephone Number __(908) 902-5900__

Attorney(s) for Plaintiff __Eric Inselberg__

__ERIC INSELBERG__

Plaintiff(s)

Vs.

__NEW YORK FOOTBALL GIANTS, INC. et. al.__

Defendant(s)

# Superior Court of New Jersey

__BERGEN__ ☑ COUNTY

__LAW__ DIVISION

Docket No: __BER-L-xxxx-14__

# CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/S/ Elisabeth Ann Strom
Clerk of the Superior Court

DATED: __01/28/2014__

Name of Defendant to Be Served: __Edward Skiba__

Address of Defendant to Be Served: __Quest Diagnostics Training Center, 1925 Giants Drive, East Rutherford, NJ 07073__

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

SUMMONS

Attorney(s) <u>Michael S. Kasanoff/Brian C. Brook</u>

Office Address <u>157 Broad Street, Suite 321, P.O. Box 8175</u>

Town, State, Zip Code <u>Red Bank, NJ 07701</u>

Telephone Number  <u>(908) 902-5900</u>

Attorney(s) for Plaintiff <u>Eric Inselberg</u>

<u>ERIC INSELBERG</u>

Plaintiff(s)

Vs.

<u>NEW YORK FOOTBALL GIANTS, INC. et. al.</u>

Defendant(s)

**Superior Court of New Jersey**

<u>BERGEN</u>   ▼ COUNTY

<u>LAW</u>   DIVISION

Docket No: <u>BER-L-xxxx-14</u>

**CIVIL ACTION SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/s/ Elisabeth Ann Strom
Clerk of the Superior Court

DATED:  <u>01/28/2014</u>

Name of Defendant to Be Served: <u>Edward Wagner, Jr.</u>

Address of Defendant to Be Served: <u>Quest Diagnostics Training Center, 1925 Giants Drive, East Rutherford, NJ 07073</u>

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

## SUMMONS

Attorney(s) Michael S. Kasanoff/Brian C. Brook

Office Address 157 Broad Street, Suite 321, P.O. Box 8175

Town, State, Zip Code Red Bank, NJ 07701

Telephone Number (908) 902-5900

Attorney(s) for Plaintiff Eric Inselberg

ERIC INSELBERG

Plaintiff(s)

Vs.

NEW YORK FOOTBALL GIANTS, INC. et. al.

Defendant(s)

# Superior Court of New Jersey

BERGEN ☑ COUNTY

LAW DIVISION

Docket No: BER-L-xxxx-14

# CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/S/ Elisabeth Ann Strom
Clerk of the Superior Court

DATED: 01/28/2014

Name of Defendant to Be Served: Eli Manning

Address of Defendant to Be Served: Quest Diagnostics Training Center, 1925 Giants Drive, East Rutherford, NJ 07073

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

**SUMMONS**

Attorney(s) <u>Michael S. Kasanoff/Brian C. Brook</u>

Office Address <u>157 Broad Street, Suite 321, P.O. Box 8175</u>

Town, State, Zip Code <u>Red Bank, NJ 07701</u>

Telephone Number <u>(908) 902-5900</u>

Attorney(s) for Plaintiff <u>Eric Inselberg</u>

<u>ERIC INSELBERG</u>

_____ Plaintiff(s)

Vs.

<u>NEW YORK FOOTBALL GIANTS, INC. et. al.</u>

_____ Defendant(s)

# Superior Court of New Jersey

<u>BERGEN</u>  ▼ COUNTY

<u>LAW</u>  DIVISION

Docket No: <u>BER-L-xxxx-14</u>

# CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

   The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

   If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

   If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

                                   /s/ Elisabeth Ann Strom
                                   Clerk of the Superior Court

DATED:  <u>01/28/2014</u>

Name of Defendant to Be Served: <u>John K. Mara</u>

Address of Defendant to Be Served: <u>Quest Diagnostics Training Center, 1925 Giants Drive, East Rutherford, NJ 07073</u>

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

**SUMMONS**

Attorney(s)  Michael S. Kasanoff/Brian C. Brook

Office Address  157 Broad Street, Suite 321, P.O. Box 8175

Town, State, Zip Code Red Bank, NJ 07701

Telephone Number  (908) 902-5900

Attorney(s) for Plaintiff Eric Inselberg

ERIC INSELBERG

Plaintiff(s)

Vs.

NEW YORK FOOTBALL GIANTS, INC. et. al.

Defendant(s)

**Superior Court of
New Jersey**

BERGEN ▾ COUNTY

LAW DIVISION

Docket No: BER-L-xxxx-14

**CIVIL ACTION
SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/s/ Elizabeth Ann Strom
Clerk of the Superior Court

DATED:  01/28/2014

Name of Defendant to Be Served: Joseph Skiba

Address of Defendant to Be Served:  Quest Diagnostics Training Center, 1925 Giants Drive, East Rutherford, NJ 07073

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

SUMMONS

Attorney(s) Michael S. Kasanoff/Brian C. Brook

Office Address 157 Broad Street, Suite 321, P.O. Box 8175

Town, State, Zip Code Red Bank, NJ 07701

Telephone Number (908) 902-5900

Attorney(s) for Plaintiff Eric Inselberg

ERIC INSELBERG

Plaintiff(s)

Vs.

NEW YORK FOOTBALL GIANTS, INC. et. al.

Defendant(s)

**Superior Court of**
**New Jersey**

BERGEN      ☑ COUNTY

LAW      DIVISION

Docket No: BER-L-xxxx-14

**CIVIL ACTION**
**SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/S/ Elisabeth Ann Strom
Clerk of the Superior Court

DATED: 01/28/2014

Name of Defendant to Be Served: New York Football Giants, Inc.

Address of Defendant to Be Served: Quest Diagnostics Training Center, 1925 Giants Drive, East Rutherford, NJ 07073

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

**SUMMONS**

Attorney(s) <u>Michael S. Kasanoff/Brian C. Brook</u>

Office Address <u>157 Broad Street, Suite 321, P.O. Box 8175</u>

Town, State, Zip Code <u>Red Bank, NJ 07701</u>

Telephone Number <u>(908) 902-5900</u>

Attorney(s) for Plaintiff <u>Eric Inselberg</u>

<u>ERIC INSELBERG</u>

Plaintiff(s)

Vs.

<u>NEW YORK FOOTBALL GIANTS, INC. et. al.</u>

Defendant(s)

# Superior Court of New Jersey

<u>BERGEN</u>  🔽 COUNTY

<u>LAW</u>  DIVISION

Docket No: <u>BER-L-xxxx-14</u>

# CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

/s/ *Elisabeth Ann Strom*
Clerk of the Superior Court

DATED: <u>01/28/2014</u>

Name of Defendant to Be Served: <u>William J. Heller</u>

Address of Defendant to Be Served: <u>Quest Diagnostics Training Center, 1925 Giants Drive, East Rutherford, NJ 07073</u>

Revised 09/04/2012, CN 10792-English (Appendix XII-A)

BRIAN C. BROOK (Bar No. 050442013)    MICHAEL S. KASANOFF (Bar No. 035751993)
CLINTON BROOK & PEED    157 Broad Street, Suite 321
641 Lexington Ave., 13th Floor    P.O. Box 8175
New York, New York 10022    Red Bank, New Jersey 07701
Tel: (212) 328-9559    Tel: (908) 902-5900
Fax: (212) 328-9560    Fax: (732) 741-7528
brian@clintonbrook.com    mkasanoff@att.net

*Attorneys for Plaintiff Eric Inselberg*

| | |
|---|---|
| ERIC INSELBERG, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION |
| Plaintiff, | BERGEN COUNTY |
| | |
| v. | Docket No. |
| | |
| NEW YORK FOOTBALL GIANTS, INC., | Civil Action |
| JOHN K. MARA, WILLIAM J. HELLER, | |
| CHRISTINE PROCOPS, EDWARD | |
| WAGNER, JR., JOSEPH SKIBA, | |
| EDWARD SKIBA, ELI MANNING, | **ACKNOWLEDGMENT OF SERVICE** |
| BARRY BARONE, PARK CLEANERS, | |
| INC. and JOHN DOES A-Z, | |
| | |
| Defendants. | |

Service of the annexed Summonses and Complaints are hereby acknowledged this ___5 th___

day of ___February___, 2014 on behalf of the following Defendants:

NEW YORK FOOTBALL GIANTS, INC., JOHN K. MARA, WILLIAM J. HELLER, CHRISTINE PROCOPS, EDWARD WAGNER, JR., JOSEPH SKIBA, EDWARD SKIBA, and ELI MANNING

McCARTER & ENGLISH, LLP

By: ___William J. O'Shaughnessy___
      William J. O'Shaughnessy